869 F.2d 917
 MAY-SOM GULF, INC., Al and Jerry's Service Center, Inc.;
Yaron Anitai d/b/a Quality Gulf; William J. Hewitt d/b/a
Warren-Munn Gulf; Cedar Green Gulf Service Center, Inc.;
Mary M. D'Andrea d/b/a Ledgewood Gulf; Richard G. Ellis
d/b/a Ellis Gulf Service; John Divincenzo d/b/a
Warrensville Gulf; Bill Vanhoose d/b/a Bill's Gulf; Slane
& Johnson, Inc.; D.A. Moyer, Inc. d/b/a Reynoldsburg Gulf;
and Robert H. Headman, Plaintiffs-Appellants,
v.
CHEVRON U.S.A., INC. and Cumberland Farms, Inc., Defendants-Appellees.
 No. 87-4085.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 11, 1988.
Decided March 9, 1989.
 
 Glenn D. Waggoner (argued), Donahue & Scanlon, Cleveland, Ohio, James A. Meaney, Crabbe, Brown, Jones, Potts & Schmidt, Columbus, Ohio, for plaintiffs-appellants.
 William H. Wallace, Keith L. Carson, Thompson, Hine & Flory, Cleveland, Ohio, Joseph J. Dehner, Frost & Jacobs, Cincinnati, Ohio, E. Timothy Columbus, James R. Loftis, I, John B. Williams, Collier, Shannon, Rill & Scott, Washington, D.C., Maynard F. Thomson, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Robert P. Taylor (argued), San Francisco, Cal., for defendants-appellees.
 Before KEITH, JONES and MILBURN, Circuit Judges.
 KEITH, Circuit Judge.
 
 
 1
 In 1984, defendant Chevron U.S.A., Inc. ("Chevron") purchased Gulf Oil Corporation ("Gulf"). The acquired properties, including oil refineries, gasoline terminals, service stations and service station franchise agreements, retained the Gulf trademark. In 1986, Chevron sold its Ohio-based, Gulf marketing operations ("Ohio Gulf") to defendant Cumberland Farms, Inc. ("Cumberland"). Prior to the sale, the plaintiffs, twelve independent Ohio Gulf service station dealers, maintained franchise agreements with Chevron to sell motor fuel under the Gulf trademark. The plaintiffs brought this civil action complaining that Chevron's sale of Ohio Gulf to Cumberland constructively terminated their franchises in violation of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. Secs. 2801-2806. The plaintiffs also asserted state law claims for breach of contract and tortious interference with contract. The district court granted the defendants' motions for summary judgment and dismissed the plaintiffs' case. For the following reasons, we AFFIRM.
 
 I.
 A.
 
 2
 After Chevron's acquisition of Gulf in 1984, Chevron's aggregate corporate debt exceeded $15 billion. To reduce the size of that debt, Chevron solicited bids for the purchase of its operations in ten New England and mid-Atlantic states. On May 31, 1986, Chevron sold its Gulf marketing assets in the Northeast to Cumberland for $250 million (the "Northeast sale").[1]
 
 
 3
 Later in 1986, Chevron began to evaluate the possible sale of Ohio Gulf, except for those Gulf assets located in the Cincinnati, Ohio area. Chevron contacted Cumberland and several other buyers who had the resources necessary to fulfill Chevron's commitments to its employees and dealers. On August 26, 1986, Chevron's Board of Directors conditionally accepted a bid from Cumberland, subject to the negotiation and execution of a formal purchase and sale agreement. On October 15, 1986, Chevron and Cumberland signed the Ohio Asset Purchase Agreement (the "Ohio sale"). For a price in excess of $13 million, Cumberland purchased the following assets from Chevron: two petroleum distribution terminals, an auto accessories sales center, forty-six service stations (including those leased to the plaintiffs), and trademark agreements, leases, and supply contracts with dealers operating under the Gulf trademark (including the plaintiff dealers). The Ohio sale closed on December 1, 1986.
 
 
 4
 Chevron structured both the Northeast sale and the Ohio sale to protect the continuity of dealer leases and supply contracts under the Gulf trademark. Pursuant to Section 2.5 of the Ohio Asset Purchase Agreement, Cumberland is required to assume all of Chevron's contractual commitments, including its trademark agreements, dealer leases and supply agreements. In addition, Section 7.6 of the Purchase Agreement requires Cumberland, as franchise agreements subject to the PMPA approach expiration, to " 'offer, in good faith, ... a new franchise on terms and conditions which are not discriminatory' " to each current dealer. See Brief of Appellee Chevron U.S.A., Inc. at 4 (quoting Ohio Asset Purchase Agreement).
 
 
 5
 To allow the service station dealers to retain their Gulf identities, Chevron granted Cumberland the exclusive use of the Gulf trademark in Ohio. Cumberland was licensed to use the trademark for fifteen years at no royalty, with an option to renew the license indefinitely for an annual royalty of $100,000. Chevron also permitted Cumberland to accept both Chevron and Gulf credit cards at Ohio Gulf service stations. In addition, many of Chevron's marketing employees were retained by Cumberland to insure continuity in the operations of Ohio Gulf.
 
 B.
 
 6
 On November 18, 1986, after the Ohio Asset Purchase Agreement was signed, but before the deal closed, Chevron notified the affected Gulf service station dealers of the Ohio sale. The notice was sent by certified mail and provided that:
 
 
 7
 [A]ll of Chevron's agreements with Gulf ... dealers in the relevant area will be assigned to Cumberland Farms. Cumberland Farms will assume all of Chevron's obligations to its Gulf ... dealers under these agreements.
 
 
 8
 May-Som Gulf, Inc. v. Chevron U.S.A., Inc., Bus. Franchise Guide (CCH) p 9000 at 18, 324 (N.D. Ohio 1987) (quoting November 18, 1986 Letter from Chevron to Gulf dealers in Ohio). The letter also explained to the dealers that:
 
 
 9
 Chevron does not believe that the sale to Cumberland Farms of Chevron's marketing assets in the relevant area and the assignment to and assumption by Cumberland Farms of Chevron's ... dealer agreements in that area triggers the PMPA or represents a termination or nonrenewal of your Dealer Contract of Sale, Service Station Lease ... and related agreements with Chevron ("dealer agreements"). Your dealer agreements with Chevron will be transferred to another supplier who will honor all of the terms and conditions of those agreements and will have the right to continue to authorize you to utilize the Gulf trademarks and brand name. You will retain all of your rights under the PMPA against Cumberland Farms, your new supplier.
 
 
 10
 On the chance, however, that someone might later claim that this transfer involves a termination or nonrenewal that is subject to the PMPA, we are taking the precaution of giving you formal notice of nonrenewal of your dealer agreements in accordance with the PMPA. We wish to repeat that in fact your agreements with Chevron will continue in full force and effect and will be renewed by Cumberland Farms--unless Cumberland Farms independently has grounds under the PMPA to terminate or not to renew those agreements.
 
 
 11
 Your present dealer agreements will not, however, be renewed by Chevron, and Chevron hereby gives you notice that those agreements and your relationship with Chevron will not be renewed by Chevron and will expire as of the later of (i) 180 days after your receipt of this notice or (ii) the expiration date of the current term of those agreements. Chevron is taking this action because of Chevron's determination to withdraw from the marketing of motor fuels through retail outlets in the relevant geographic market area.
 
 
 12
 Id. at 18,324-25.
 
 
 13
 After receiving Chevron's November 18, 1986 letter, the plaintiffs brought this civil action pursuant to 15 U.S.C. Secs. 2801-2806. On November 24, 1986, the plaintiffs filed a complaint against Chevron and Cumberland contending: (1) that the assignment of their franchises was invalid under Ohio law, and thus, that the assignment constructively terminated their franchises in violation of the PMPA; and (2) the manner in which the constructive termination occurred violated the PMPA.
 
 
 14
 After the parties conducted extensive discovery, Chevron and Cumberland filed motions for summary judgment on May 15, 1987. Based on the evidence of record, Chevron and Cumberland argued that plaintiffs could not, as a matter of law, demonstrate a genuine issue for trial as to any fact material to their claims. The plaintiffs filed a brief to oppose the summary judgment motions on May 27, 1987. The district court, however, held that on the undisputed material facts, Chevron and Cumberland were entitled to summary judgment as a matter of law. May-Som Gulf, Inc., Bus. Franchise Guide (CCH) p 9000 at 18,329.
 
 
 15
 In a memorandum opinion, the district court held that under Ohio law governing the delegation and assignment of contracts, Chevron's assignment to Cumberland of the Gulf franchise agreements was lawful and valid. Thus, the assignment did not constructively terminate the plaintiffs' franchises in violation of the PMPA. See id. at 18,326-27. The district court then found that even if the assignment was invalid, the franchises were lawfully terminated under the PMPA because Chevron and Cumberland established the affirmative defense of withdrawal from the relevant geographic market, pursuant to 15 U.S.C. Sec. 2802(b)(2)(E). See id. at 18,327-28. The district court next held that Chevron complied with the PMPA's notice requirements to establish the market withdrawal defense. See id. at 18,328-29. Because the PMPA preempts state law governing service station franchise termination, the district court concluded that the plaintiffs' state law claims for breach of contract and tortious interference with contract were without merit. Finally, the district court dismissed the plaintiffs' complaint in its entirety on November 2, 1987. The plaintiffs filed a joint and timely notice of appeal on November 30, 1987.
 
 II.
 
 16
 In 1978, Congress enacted the PMPA to establish minimum federal standards governing the termination and nonrenewal of motor fuel marketing franchises and the notice which franchisors must give franchisees before termination or nonrenewal of their franchises.[2] S.Rep. No. 731, 95th Cong., 2d Sess. 15, reprinted in 1978 U.S.Code Cong. & Admin.News 873, 877 [hereinafter S.Rep.]. Congress was primarily concerned with franchisors' use of the threat of termination to force franchisees to comply with corporate marketing policies. See S.Rep. at 876-77. Because "the franchisors generally have enormous economic power, particularly in times of oil shortages, and the franchisees are usually small business people," Congress explicitly limited "the common law powers of the oil companies to deal with whom they wished." Russo v. Texaco, Inc. 630 F.Supp. 682, 687 (E.D.N.Y.), aff'd, 808 F.2d 221 (2d Cir.1986).
 
 
 17
 Thus, Congress adopted the PMPA to regulate coercive relationships between franchisors and franchisees, and to protect independent service station dealers from arbitrary and discriminatory franchise terminations by large oil corporations. See Bellmore v. Mobil Oil Corp., 783 F.2d 300, 304 (2d Cir.1986). In accordance with congressional intent, we must grant the PMPA "a liberal construction consistent with its overriding purpose to protect franchisees." Brach v. Amoco Oil Co., 677 F.2d 1213, 1221 (7th Cir.1982). See also Comment, Judicial Interpretation of the Petroleum Marketing Practices Act: Conflict and Diversity, 32 Emory L.J. 273, 318 (1983) (concluding that the courts should interpret the PMPA according to "Congress' clearly interventionist stance in ... the petroleum industry") [hereinafter Comment, PMPA Interpretation ].
 
 
 18
 Our interpretation of the PMPA is animated by two additional concerns. First, we recognize that the Act constituted a diminution of the property rights of franchisors and thus should not be interpreted to reach beyond its original language and purpose. See Checkrite Petroleum, Inc. v. Amoco Oil Co., 678 F.2d 5, 8 (2d Cir.) ("Strict construction is particularly appropriate where, as here, the statute in question is in derogation of common law rights."), cert. denied, 459 U.S. 833, 103 S.Ct. 74, 74 L.Ed.2d 73 (1982).
 
 
 19
 Second, we note that the PMPA strikes an explicit statutory balance between the interests of franchisees in freedom from arbitrary and discriminatory franchise terminations and the interests of franchisors in freedom to transfer motor fuel marketing assets in response to changing market conditions. Congress, no doubt, intended strong protection of the interests of franchisees. However, in an age of increasing corporate competition, the major petroleum firms must retain the freedom to seek greater economic efficiency through corporate reorganizations, mergers and acquisitions. In Russo v. Texaco, Inc., 630 F.Supp. 682 (E.D.N.Y.1986), the district court held that Texaco complied with the PMPA when it acquired Getty Oil and sold Getty's Northeast marketing assets to Power Test. See id. at 683. The court then observed that:
 
 
 20
 There is nothing in the language of the [PMPA] suggesting that a major national acquisition and large scale divestiture for bona fide business reasons was intended to be stymied by the right of individual franchisees to insist on a prior relationship on exactly its former terms. A permanent status quo in the relationships of major national oil corporations with each other was not mandated by Congress through the PMPA. In a rapidly changing economy fixed preservation of business relationships may spell financial death to the detriment of franchisees as well as franchisors.
 
 
 21
 Id. at 688 (emphasis added).
 
 III.
 
 22
 On appeal, plaintiffs initially argue that the district court erred in granting summary judgment in favor of Chevron and Cumberland on the claim that plaintiffs' service station franchises were constructively terminated in violation of the PMPA. Plaintiffs argue that the district court interpreted the PMPA in an unreasonably narrow manner and failed to consider facts evidencing the increased burdens placed on their Gulf franchises. We conclude, however, that the district court correctly interpreted the parameters of the PMPA and did not err in dismissing plaintiffs' claims.
 
 
 23
 In Barnes v. Gulf Oil Corp., 795 F.2d 358 (4th Cir.1986), Gulf, the franchisor, sold a single service station to Anderson, a branded jobber, and assigned to Anderson the unexpired portion of the Gulf franchise agreement with Barnes, the franchisee. See id. at 359. The Fourth Circuit initially explained that the PMPA defines a franchise in terms of three elements: "a contract to use the refiner's trademark, a contract for the supply of motor fuel to be sold under the trademark, and a lease of the premises at which motor fuel is sold." See id. at 360 (citing S.Rep. at 888). The court then reversed a summary judgment in favor of the franchisor, holding (1) that the assignment of a franchise that increases the franchisees' gasoline cost over the stipulated franchise price furnishes a cause of action against the franchisor under the PMPA; and (2) that if the franchisee can prove at trial that the assignment of the franchise violated state law, then this would also constitute an unjustified franchise termination under the PMPA. See id. at 362-64.
 
 
 24
 The Fourth Circuit's grounds, under the PMPA, for finding a "constructive termination" of a franchise agreement were recently reconsidered by the Ninth Circuit. In Fresher v. Shell Oil Co., Bus. Franchise Guide (CCH) p 8800 (D.Or.1987), aff'd, 846 F.2d 45 (9th Cir.1988), the plaintiffs, service station franchisees, alleged that Shell, the franchisor, had agreed to assign their lease and supply agreements to Pacific Northern Oil Corporation, in violation of the PMPA. See 846 F.2d at 46. The Ninth Circuit held that the district court properly dismissed the franchisees' case because they failed to allege that any of the three statutory components of a franchise agreement were breached by the franchisor. See id. at 46-47.
 
 
 25
 After evaluating these principles and the contentions of the plaintiffs, we hold that to sustain a claim, under the PMPA, that a franchisor assigned and thereby constructively terminated a franchise agreement, the franchisee must prove either: (1) that by making the assignment, the franchisor breached one of the three statutory components of the franchise agreement, (the contract to use the refiner's trademark, the contract for the supply of motor fuel, or the lease of the premises), and thus, violated the PMPA; or (2) that the franchisor made the assignment in violation of state law and thus, the PMPA was invoked. See Fresher, 846 F.2d at 46-47; Barnes, 795 F.2d at 362-64.[3] See also Little Oil Co., Inc. v. Atlantic Richfield Co., 852 F.2d 441, 444 & n. 5 (9th Cir.1988) (examining and approving of the Fresher rational).
 
 A.
 
 26
 As to the first ground for relief, plaintiffs have not established a breach of their franchise agreements by Chevron nor Cumberland. First, Chevron has granted Cumberland exclusive use of the Gulf trademark for fifteen years, with an option to renew indefinitely. Thus, plaintiffs cannot prove an increased risk that they will be denied use of the Gulf trademark, but merely speculate that Cumberland will breach the trademark component of their franchise agreements. Second, Cumberland has secured agreements to purchase gasoline from Standard Oil Company ("Sohio"), Chevron's Philadelphia refinery, and a refinery in Newfoundland, Canada. Thus, there is nothing other than plaintiffs' speculations to suggest that Cumberland will breach the supply component of their franchise agreements. Third, plaintiffs have not advanced any arguments, on appeal, suggesting that Cumberland breached the lease component of their franchise agreements. Thus, on the facts presented here, we conclude that plaintiffs cannot secure relief on the ground that Chevron or Cumberland breached one of the three components of their Gulf franchise agreements.
 
 B.
 
 27
 As to the second ground for relief, plaintiffs have not established that Chevron's assignment of their Gulf franchises to Cumberland was invalid under state law, and thus, constructively terminated the franchises in violation of the PMPA.
 
 
 28
 The PMPA identifies the exclusive means by which a franchisor may terminate or nonrenew a franchise. See 15 U.S.C. Sec. 2802(a). For the PMPA requirements to apply, however, the franchisee must prove that there has been a "termination" or "nonrenewal" of the franchise agreement within the meaning of the Act. See 15 U.S.C. Sec. 2805(a)-(c); Burns Bros., Inc. v. RMT Properties, Inc., 2 Bus. Franchise Guide (CCH) p 8468 (D.Or. Aug. 9, 1985), aff'd, 805 F.2d 1039 (9th Cir.1986). The PMPA states that:
 
 
 29
 Nothing in this subchapter ... prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provisions of State law which permits such transfer or assignment without regard to any provision of the franchise.
 
 
 30
 15 U.S.C. Sec. 2806(b). See also Prestin v. Mobil Oil Corp., 741 F.2d 268 (9th Cir.1984).
 
 
 31
 Thus, Ohio law governs the validity of Chevron's assignment of the Gulf franchises to Cumberland. The district court correctly concluded that if the assignment is valid under Ohio law, it is neither a termination nor a nonrenewal, in violation of the PMPA. May-Som Gulf, Inc., Bus. Franchise Guide (CCH) p 9000 at 18,325. See also McGee v. Gulf Oil Corp., 2 Bus. Franchise Guide (CCH) p 8379 (N.D.Ala. June 10, 1985); Aldrich v. Amoco Oil Co., 2 Bus. Franchise Guide (CCH) p 8322 (S.D. Iowa Jan. 7, 1985). In addition, the validity of the assignment must be judged on the facts before the court, not speculative allegations concerning the future. See Fresher, 846 F.2d at 47 (stating that if, at some future time, the franchisor's assignee breaches any of the statutory components of the franchise agreement, the franchisees can then bring suit under the PMPA).
 
 
 32
 The district court correctly explained that in Ohio, the general rule is that rights under a contract may be assigned and duties may be delegated. See American Bonding & Trust Co. v. Baltimore & O.S. R.R., 124 F. 866, 871-73 (6th Cir.), cert. denied, 191 U.S. 575, 24 S.Ct. 846, 48 L.Ed. 308 (1903); Crowe v. Riley, 63 Ohio St. 1, 5, 57 N.E. 956 (1900); Himrod Furnace Co. v. Cleveland & M. R.R., 22 Ohio St. 451, 460 (1872).
 
 
 33
 Because the Gulf franchise agreements include a contract for the sale of motor fuel, this transaction is also governed by the Ohio law of sales contracts. Assignments of sales contracts are explicitly permitted unless: (1) the parties have agreed to nonassignment; (2) the contracts are personal in nature; (3) the assignment materially changes the duties owed; or (4) the assignment materially increases the burden of performing the duties owed, or materially impairs the likelihood of return performance. The Ohio law governing the assignment of sales contracts provides that:
 
 
 34
 (A) A party may perform his duty through a delegate unless otherwise agreed or unless the other party has a substantial interest in having his original promisor perform or control the acts required by the contract. No delegation of performance relieves the party delegating of any duty to perform or any liability for breach.
 
 
 35
 (B) Unless otherwise agreed all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance. A right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation can be assigned despite agreement otherwise.
 
 
 36
 Ohio Rev.Code Ann. Sec. 1302.13 (Anderson 1979).
 
 
 37
 Plaintiffs do not allege that they had an agreement with Chevron which prohibited assignment of the Gulf franchises. Nor do plaintiffs contend that Chevron's duties under the Gulf franchise agreements were personal in nature. Thus, the proscription of Ohio Rev.Code Ann. Sec. 1302.13(A) does not apply to the assignment by Chevron to Cumberland. See McGee, 2 Bus. Franchise Guide (CCH) p 8379 at 15,348 ("From the nature of the contracts involved, [the franchisor's] obligations were clearly not of such a personal nature as to prohibit assignment.").
 
 
 38
 Plaintiffs therefore argue, under Ohio Rev.Code Ann. Sec. 1302.13(B), that the assignment is invalid because it materially increases the burdens associated with performance of their franchise duties and materially impairs their chances of obtaining return performance. When plaintiffs alleged these burdens below, the district court dismissed their case. On appeal, plaintiffs' arguments retain fatal flaws. Initially, plaintiffs' claims of increased burdens are often irrelevant to the duties actually owed by Chevron and Cumberland under the Gulf franchise agreements. In addition, plaintiffs' evidence is simply insufficient to support the charges alleged.
 
 
 39
 First, plaintiffs argue that as a direct result of the Ohio sale, they must pay higher prices for gasoline. The district court noted that "motor fuel supply contracts do not state a specific price at which fuel will be sold to dealers," and properly held that the plaintiffs' price increase allegations could not constitute a contractual burden. May-Som Gulf, Inc., Bus. Franchise Guide (CCH) p 9000 at 18,326. In addition, plaintiffs allege that Cumberland discontinued Chevron's "discount for cash program," which allowed plaintiff to charge less for gasoline than competing service stations. Plaintiffs, however, cannot sustain this claim because the "discount for cash" program was an informal arrangement, not a requirement of the Gulf franchise agreements. See id.
 
 
 40
 Second, plaintiffs argue that Cumberland has not met its obligation to supply them with fuel meeting the Gulf trademark specifications. Plaintiffs, however, present no laboratory tests, nor any evidence other than their own subjective testimony to substantiate their claims. Thus, the district court correctly concluded that the "[r]esults of the [Chevron] testing establish that gasoline sold by Cumberland under the Gulf trademark complies with Gulf standards.... The plaintiffs' argument on this issue is based on subjective impressions; this does not establish a material issue of fact." Id. at 18,326.
 
 
 41
 Third, plaintiffs argue that their franchise agreements are burdened because Cumberland's ability to supply them with gasoline is uncertain. Plaintiffs, however, have presented no evidence that Gulf dealers have suffered material disruptions in their gasoline supplies since the Ohio sale. The district court properly found that plaintiffs "identified no facts on which they rely for the belief that Cumberland and Sohio may be unable to continue their supply arrangements.... Thus, there is nothing--other than the plaintiffs' speculations--to suggest Cumberland will be unable to meet its commitments to supply the plaintiffs with motor fuel." See id.
 
 
 42
 Fourth, plaintiffs contend that the assignment has materially increased their burdens because Cumberland does not provide promotional programs, marketing services, dealer training or advertising comparable to Chevron's dealer support services. Rejecting plaintiffs' argument, the district court properly found that as to these dealer support services, "plaintiffs had no contractual right which could be burdened by assignment of the franchise. Further, such arrangements are not part of a franchise under the PMPA and do not create rights under the PMPA." See id. at 18,327; Aldrich v. Amoco Oil Co., Bus. Franchise Guide (CCH) p 8322 at 15,112-113 (S.D. Iowa 1985). See also Comment, PMPA Interpretation at 288 ("[S]ince a franchise is defined in terms of a motor fuel trademark and the sale of gasoline, a franchise does not include separate agreements regarding credit card use, equipment financing, or the price of tires, batteries and accessories; suppliers can therefore terminate these agreements without regard to the PMPA.").
 
 
 43
 On appeal, plaintiffs argue that the assignment materially burdened their franchise agreements because they have suffered business disruption, lack of information and uncertainty. These claims arise from several minor problems, including billing delays, service station maintenance delays, changes in auto accessories to be sold, and changes in warehouse locations. All of these problems arose in the transition period immediately following the Ohio sale. Plaintiffs, however, have failed to present evidence of substantial and ongoing problems related to Cumberland's performance of franchise duties. The transitional problems cited by plaintiffs are simply not of sufficient substance to constitute a materially increased burden or impairment of return performance on their franchise agreements.
 
 
 44
 Accordingly, we conclude that plaintiffs cannot secure relief on the ground that Chevron assigned the Gulf franchises to Cumberland in violation of state law. We agree with the finding of the district court that "there is no material issue of fact as to whether the assignment of franchises materially increased the burdens or risks. Therefore, there were no constructive terminations." May-Som Gulf, Inc. Bus. Franchise Guide (CCH) p 9000 at 18,327.
 
 IV.
 
 45
 Plaintiffs next argue that the district court erred in granting summary judgment in favor of Chevron and Cumberland on the claim that plaintiffs' service station franchises were nonrenewed in violation of the PMPA. We agree, however, with the district court's conclusion that even if the assignments were invalid, Chevron lawfully nonrenewed or terminated the Gulf franchises by withdrawing from the relevant geographic market pursuant to the PMPA, 15 U.S.C. Sec. 2802(b)(2)(E).
 
 
 46
 A franchisor may terminate or nonrenew a franchise in compliance with the PMPA, if: (1) the franchisor makes a good faith determination, in the normal course of business, to withdraw from the retail marketing of motor fuels in the relevant geographic area; (2) the determination "was made after the date such franchise was entered into or renewed;" (3) the determination "was based upon ... changes in relevant facts and circumstances after such date;" (4) the franchisor gave adequate notice of termination or nonrenewal to the franchisee; and (5) the assignee "offers, in good faith, a franchise to the franchisee on terms and conditions that are not discriminatory." See 15 U.S.C. Sec. 2802(b)(2)(E), Sec. 2804.
 
 
 47
 Plaintiffs now contend that Chevron's acquisition of Gulf in 1984 and subsequent assumption of a substantial debt burden caused both the Ohio sale and the nonrenewal of plaintiffs' Gulf franchise agreements. Plaintiffs continue that the acquisition of Gulf and the debt burden were the actual "changed facts and circumstances" that motivated Chevron's withdrawal from the Ohio geographic market. Plaintiffs then conclude that these "changed facts and circumstances" do not support Chevron's market withdrawal defense under the PMPA, because Chevron's assumption of the debt occurred not after, but prior to Chevron's renewal of plaintiffs' franchises.
 
 
 48
 In response, Chevron argues that the changes in relevant facts and circumstances which led to its withdrawal from the Ohio market included determinations that: (1) Cumberland was a willing buyer that made an acceptable offer to purchase Ohio Gulf; (2) Cumberland was capable of fulfilling Chevron's obligations to its Ohio Gulf dealers; (3) the Ohio sale complied with antitrust law and would be approved by the Federal Trade Commission; and (4) Cumberland would enter a purchase agreement that effected an orderly and efficient transition from Chevron's to Cumberland's ownership. Thus, Chevron concluded that its withdrawal from the Ohio market complied fully with the requirements of the PMPA.
 
 
 49
 Chevron's assertion of the market withdrawal defense is supported by both the legislative history of the Act and the pertinent case law. The PMPA legislative history suggests that the presence of a willing and acceptable buyer is a fundamental change in market conditions: "Particularly important is that [this] legislation ... recognize[s] the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." S.Rep. at 877 (emphasis added). Moreover, in Southern Nev. Shell Dealers Ass'n. v. Shell Oil Co., 634 F.Supp. 65 (D.Nev.1985), the district court held, under the PMPA, that Shell Oil, the franchisor, could lawfully assert the market withdrawal defense to franchise terminations. See id. at 70. Even though the plaintiff franchisees claimed that Shell had "an adequately profitable business" in the relevant geographic market, the district court concluded that Shell's choice to withdraw from the region and to sell its marketing assets to a willing and acceptable buyer was "a reasonable business judgment" made in compliance with the PMPA. See id. at 69. See also Jiminez v. BP Oil, Inc., 853 F.2d 268, 274 (9th Cir.1988) (concluding that the franchisor, BP Oil, did not violate the PMPA by selling its Washington, D.C.-based, marketing assets and withdrawing from the relevant geographic market).
 
 
 50
 We are persuaded that prior to the Ohio sale, Chevron satisfied all of the requirements for market withdrawal under the PMPA. The district court correctly concluded that:
 
 
 51
 [T]he changed facts and circumstances in this case were that Cumberland offered to purchase its assets and that Chevron accepted the offer. The bidding instructions for the Ohio assets informed prospective bidders that no decision to sell had been reached by Chevron and that it reserved the right to reject all bids.... Chevron asserts, and the plaintiffs do not dispute, that it would have stayed in the Ohio market if Cumberland had not been an acceptable buyer.... The availability of a suitable buyer was, therefore, a changed circumstance upon which Chevron based its decision.
 
 
 52
 May-Som Gulf, Inc., Bus. Franchise Guide (CCH) p 9,000 at 18,328 (citations omitted). The district court also found that:
 
 
 53
 Chevron asserts that the decision [to withdraw from the marketing of Gulf products in the relevant geographic area] was made no earlier than August 26, 1986, the date on which its board of directors first considered the sale to Cumberland.... The last date on which a plaintiff's franchise was renewed was August 15, 1986. Thus the decision to withdraw was made after the plaintiffs' franchises were renewed.
 
 
 54
 See id. at 18,327-28 (citations omitted). Thus, Chevron made a good faith business decision to sell Ohio Gulf based upon an acceptable purchase offer from Cumberland. In conformity with the PMPA, this "changed fact" occurred after Chevron renewed the last plaintiff's Gulf franchise agreement.
 
 
 55
 Plaintiffs also argue that Chevron may not assert the market withdrawal defense because Cumberland has not and will not offer good faith, nondiscriminatory franchises to the plaintiffs, in accordance with the PMPA, 15 U.S.C. Sec. 2802(b)(2)(E)(iii)(II).
 
 
 56
 Chevron responds that Cumberland made a commitment, in the Ohio Asset Purchase Agreement:
 
 
 57
 [to] offer, in good faith, to each franchisee a new 'franchise' on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by [Cumberland] or franchises then in effect with respect to which [Cumberland] is the franchisor.
 
 
 58
 See id. at 18,328 (quoting Ohio Asset Purchase Agreement).
 
 
 59
 Cumberland executives previously testified that Cumberland will offer nondiscriminatory franchises to the franchisees. Plaintiffs have presented no evidence to refute the officials' testimony nor Cumberland's commitment to its Gulf franchises. Since the conclusion of the Ohio sale, plaintiffs can only point to the transitional problems of a few selected dealers. Cumberland admits to encountering minor administrative delays immediately following the Ohio sale, but remains committed to timely renewal of the plaintiffs' Gulf franchises.
 
 
 60
 Plaintiffs' primary concern is that Cumberland intends to convert their gasoline service stations into convenience stores. Plaintiffs, however, have failed to present evidence sufficient to validate this claim. In Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc. and Chevron U.S.A., Inc., No. 86-3519-Mc, slip op (D.Mass. Oct. 13, 1988), the plaintiffs, whose Gulf franchise agreements were sold by Chevron to Cumberland in the Northeast sale, presented evidence of Cumberland's intentions to convert their service stations into convenience stores and combination units. The Chestnut Hill plaintiffs also provided evidence that Cumberland had imposed exorbitant rent increases. See id. at 8 (denying defendants' summary judgment motions). In the present case, the plaintiffs have presented no similar evidence that Cumberland has drastically increased their rents or demanded that their service stations be converted into convenience stores. However, even if such facts were presented by the plaintiffs, it is unlikely that the additional evidence would justify granting their requested relief. See Ewing v. Amoco Oil Co., 823 F.2d 1432, 1438 (10th Cir.1987) (suggesting that, under the PMPA, Amoco Oil could lawfully require all of its newly-purchased, former Mobil franchises to become "3-D stations," equipped with full-service pumps, self-service pumps, and convenience stores); Baldauf v. Amoco Oil Co., 553 F.Supp. 408, 411 (W.D.Mich.1981) (holding that a franchisor, Amoco Oil, who converted a franchisee's full-service station into a high-volume pumper station, made a legitimate, good faith business decision in conformity with the PMPA, 15 U.S.C. Sec. 2802(b)(3)(A)), aff'd, 700 F.2d 326 (6th Cir.1983). Accordingly, we find no error in the district court's conclusion that the plaintiffs' speculative allegations do not establish genuine issues of material fact. May-Som Gulf, Inc., Bus. Franchise Guide (CCH) p 9000 at 18,326. Thus, we conclude that Chevron has satisfied all of the requirements for a market withdrawal under the PMPA, 15 U.S.C. Sec. 2802(b)(2)(E).V.
 
 
 61
 The plaintiffs also argue that the district court erred in finding that Chevron gave effective notice of franchise non-renewal under the PMPA. To lawfully withdraw from the relevant geographic market, a franchisor must notify the franchisee of its intent to terminate or nonrenew the franchise at least 180 days before the actual date of termination or nonrenewal. 15 U.S.C. Sec. 2804(b)(2)(A). The franchisee must receive a written notice by personal delivery or certified mail. Such notice must state the reasons for the termination or nonrenewal of the franchise, the effective date of the termination or nonrenewal, and a summary of the relevant PMPA provisions. 15 U.S.C. Sec. 2804(c). The franchisor's justification for nonrenewal or termination must be "specific enough for the franchisee to determine whether nonrenewal rests on lawful grounds." Svela v. Union Oil Co., 807 F.2d 1494, 1498 (9th Cir.1987).
 
 
 62
 Plaintiffs admit that they received notice, by certified mail, of Chevron's sale of Ohio Gulf to Cumberland. The notice was sent on November 18, 1986, and included a summary of the PMPA and a statement of the reason for the Ohio sale: Chevron's " 'determination to withdraw from the marketing of motor fuels through retail outlets in the relevant geographic market area.' " May-Som Gulf, Inc., Bus. Franchise Guide (CCH) p 9,000 at 18,324 (quoting November 18, 1986 Letter from Chevron to Gulf dealers in Ohio). The notice stated that, although Chevron did not believe that the sale constituted a termination or nonrenewal invoking the PMPA, the dealer agreements between Chevron and the plaintiffs would end 180 days after plaintiffs received the notice or the date of current franchise expiration, whichever came later. Plaintiffs argue that this particular passage of the notice precluded them from understanding the status of their franchises or whether the nonrenewal was in compliance with the PMPA. Plaintiffs, however, filed their original complaint six days after Chevron sent the notices and clearly alleged that Chevron could not properly rely on the PMPA market withdrawal defense. We, therefore, find little merit in plaintiffs' arguments that they were precluded from exercising their franchise rights or that they misunderstood Chevron's notice of the Ohio sale.
 
 
 63
 We find the plaintiffs' reliance on Davy v. Murphy Oil Corp., 488 F.Supp. 1013 (W.D.Mich.1980), equally unpersuasive. In Davy, the plaintiffs received a two-paragraph notice of nonrenewal without a statement of reasons justifying the termination of the franchise. See id. at 1014. In the present case, plaintiffs received a three-page notice that explicitly identified the reasons for nonrenewal and provided a detailed discussion of Chevron's sale of Ohio Gulf to Cumberland. Thus, we agree with the district court's conclusion that Chevron's notices to its Ohio-based, Gulf franchisees fully complied with the requirements of the PMPA.
 
 VI.
 
 64
 For the foregoing reasons, the judgment of the Honorable John H. Manos, United States District Court for the Northern District of Ohio, is AFFIRMED.
 
 
 
 [1]
 Like the plaintiffs before this court, independent Gulf service station dealers in the Northeast complained that Chevron's sale of its Gulf marketing assets to Cumberland violated the PMPA. See Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc. and Chevron U.S.A., Inc., No. 86-3519-Mc, slip op. (D.Mass. Oct. 13, 1988). See also Florham Park Chevron, Inc. v. Chevron, U.S.A., Inc. and Cumberland Farms, Inc., Bus. Franchise Guide (CCH) p 9011 (D.N.J. Sept. 25, 1987) ("Florham Park I "); Florham Park Chevron, Inc. v. Chevron, U.S.A., Inc., and Cumberland Farms Inc., Bus. Franchise Guide (CCH) p 9012 (D.N.J. Nov. 4, 1987) ("Florham Park II "); Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., 680 F.Supp. 159 (D.N.J. Feb. 25, 1988) ("Florham Park III ")
 
 
 [2]
 The PMPA defines the participants in the franchise relationship. A franchisor is a "refiner or distributor ... who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution, of motor fuel." 15 U.S.C. Sec. 2801(3). A franchisee is "a retailer ... who is authorized or permitted, under a franchise, to use a trademark in connection with the sale ... of motor fuel." 15 U.S.C. Sec. 2801(4)
 
 
 [3]
 The Barnes decision was purportedly followed by the district court in Florham Park I, Bus. Franchise Guide (CCH) p 9011. In Florham Park I, the plaintiffs brought a PMPA action after their Gulf franchise agreements were assigned by Chevron to Cumberland in the Northeast sale. Plaintiffs argued that Chevron's assignment of their Gulf franchise agreements was a nonrenewal. See id. at 18,418. The district court agreed, holding "as a matter of law, that Chevron failed to renew its franchise relationships with plaintiffs, within the meaning of the PMPA." See id. at 18,419
 We find the Florham Park I decision to be problematic for three reasons. First, the district court did not find that Chevron or Cumberland breached the pricing provision of the Gulf franchise agreements. Second, the district court did not find that Chevron's assignment to Cumberland of the Gulf franchise agreements was invalid under New Jersey state law. Thus, the district court failed to find the necessary facts to correctly apply Barnes. Third, the Florham Park I court commented that the "cases cited by Chevron all involve transactions on a much smaller scale--assignment of a single franchise to a 'jobber'--than the Chevron-Cumberland sale of assets." See id. at 18,419. The district court, however, provided no rationale for its implicit rule that invocation of the PMPA should turn on the size of the challenged transaction. In addition, contrary to the Florham Park I court's comments, Chevron cited to Fresher v. Shell Oil Co., Bus. Franchise Guide (CCH) p 8800 (D.Or.1987), a case which was brought, under the PMPA, by several service station dealers. Agreeing substantially with the Ninth Circuit's Fresher decision, we decline, on the assignment issue, to follow Florham Park I.