CHESTNUT HILL GULF, INC., et al., Plaintiffs, Appellees,

v.

CUMBERLAND FARMS, INC., Defendant, Appellee,

Chevron, U.S.A., Inc., Defendant, Appellant.

CHESTNUT HILL GULF, INC., et al., Plaintiffs, Appellees,

v.

CUMBERLAND FARMS, INC., Defendant, Appellant.

CHESTNUT HILL GULF, INC., et al., Plaintiffs, Appellants,

v.

CUMBERLAND FARMS, INC., and Chevron U.S.A., Inc., Defendants, Appellees.

Nos. 90–1772, 90–2149, 90–1773, 90–2148, 90–2017 and 90–2150.

United States Court of Appeals, First Circuit.

Heard May 7, 1991.

Decided July 29, 1991.

See also 749 F.Supp. 331.

Robert P. Taylor with whom Walter R. Allan, Pillsbury, Madison & Sutro, San Francisco, Cal., Richard M. Reynolds, Steven M. Greenspan and Day, Berry & Howard were on brief, Hartford, Conn., for Chevron U.S.A., Inc.

John B. Williams with whom James R. Loftis, III, Marcy M. Rehberger, Collier, Shannon & Scott, Washington, D.C., Alan Van Gestel, Goodwin, Procter & Hoar, Boston, Mass., and Mark G. Howard were on brief, Canton, Mass., for Cumberland Farms, Inc.

Robert D. Cultice with whom Carl K. King, Louis J. Scerra, Jr. and Goldstein & Manello were on brief, Boston, Mass., for Chestnut Hill Gulf, Inc., et al.

Before SELYA and CYR, Circuit Judges, and BOWNES, Senior Circuit Judge.

BOWNES, Senior Circuit Judge.

This case arises under subchapter I of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2806 (the "Act" or "PMPA"). Chevron U.S.A., Inc. and Cumberland Farms, Inc., defendants-appellants, appeal judgments against them based on jury answers to special questions finding them liable for violations of the Act. There is also an appeal by one of the plaintiffs, Bolton Chevron Service, Inc., from a directed verdict for Chevron. A somewhat detailed exposition of the genesis of this case and the proceedings in the district court, as well as a discussion of the purpose and pertinent provisions of the Act, is necessary to understand the key issue: whether the Act applies.

## I.

### A. *The Sale by Chevron to Cumberland*

This case, along with a number of others, had its inception in the sale by Chevron to Cumberland of all of Chevron's assets in the states of Connecticut, Delaware, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island and Vermont. An asset purchase agreement between Chevron and Cumberland was entered into on December 19, 1985. The sale was consummated in 1986. The price for Chevron's assets was $310,207,000 subject to certain adjustments. The assets included the franchises between Chevron and the operators of its "motor fuel retail outlets." Most of the franchises were established and had a determinate

period to run; some dealers had "trial" franchises.[1] Chevron assigned to Cumberland all of the franchises, established and trial, covering the operation of its motor fuel retail outlets.

We quote in full section 8.6a of the agreement because it refers directly to the Act.

### 8.6. *Franchise Renewal.*

a. As to each and every contract transferred to Buyer pursuant to Section 1.1, which constitutes a "franchise" or evidences a "franchise relationship" as those terms are defined in the Federal Petroleum Marketing Practices Act (the "PMPA") or any applicable state law, Seller shall, prior to Closing, give written notice in accordance with the PMPA or any applicable state law to the franchisee that such contract shall not be renewed by Seller upon expiration of the current term thereof. Buyer agrees that upon expiration of the current term of any such contract, Buyer shall offer, in good faith, to each franchisee a new "franchise" on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by Buyer or franchises then in effect with respect to which Buyer is the franchisor; provided that Buyer shall have no obligation to offer a new "franchise" to such franchisee if Buyer has a valid ground for termination of the existing "franchise" or nonrenewal of the existing "franchise relationship" under the PMPA or applicable state law, and Buyer gives such notice of termination or nonrenewal to the franchisee as may be required by the PMPA or any applicable state law.

Section 8.6.b. provides in pertinent part:

b. If any lawsuit is brought by any franchisee under the PMPA or any applicable state franchise law with respect to the transactions contemplated by this Agreement or the notices of nonrenewal given by Seller pursuant to this Section 8.6, Seller shall indemnify and hold Buyer and its affiliates harmless from and against any judgment for monetary damages awarded to such franchisee in any such action.

Under the agreement, Chevron agreed to "license Cumberland" the use of its trademarks and deliver to Cumberland at the closing its "Trademark Licenses."

### B. *The Act*

Subchapter I of the Act establishes minimum Federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by franchisors or suppliers of such fuel. S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Admin.News 873.[2] Congress recognized that the often complex and competing interests involved in petroleum franchises had "led to numerous complaints by franchisees of unfair terminations or nonrenewals of their franchises by franchisors for arbitrary and even discriminatory reasons." *Id.* at 875–76. The Act was therefore designed to prevent franchisors from terminating or failing to renew franchise agreements for technical or minor contract violations or compelling franchisees to comply with franchisors' marketing policies. *Id.* at 876–77. We noted in *Veracka v. Shell Oil Co.,* 655 F.2d 445 (1st Cir.1981), that the Act's "basic effort to prevent franchise terminations reflects a recognition of the disparity of bargaining power between franchisor and

---

1. Thirteen of the plaintiffs-dealers in this case had regular franchises which Chevron was obligated to renew absent statutory grounds for nonrenewal. 15 U.S.C. § 2802(a) and (b). Two plaintiffs had "trial" franchises, which by statute have an initial term of not more than one year, 15 U.S.C. § 2803(b)(1)(C), and which the franchisor is not obligated to renew, 15 U.S.C. § 2803(b)(1)(D)(iii) and (iv). One plaintiff was a third party lessee with neither a three-year franchise (like the 13) nor a trial franchise as with the other two.

2. Subchapter II of the Act requires the testing, certification and posting of the octane rating of gasoline sold at retail and the display on any new automobile of the proper octane rating for that automobile. The purpose of subchapter III is to prohibit the subsidization of motor fuel marketing operations by refiners and wholesalers with funds or services received from other petroleum-related sources. Subsections II and III are not implicated in the case at hand.

franchisee and an effort to prevent coercive or unfair franchisor practices." *Id.* at 448.

Although Congress intended to protect franchisees from arbitrary and discriminatory franchise termination and nonrenewal, it also recognized "the legitimate needs of a franchisor to be able to terminate a franchise or not renew a franchise relationship based upon certain actions of the franchisee, including certain failures to comply with contractual obligations or upon certain changes in circumstances. Particularly important is that legislation dealing with this subject recognize the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." S.Rep. No. 731, 95th Cong., 2d Sess. 19, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 877.

We next consider the pertinent provisions of the Act. There can be no doubt that, under the Act and prior to the sale of its assets to Cumberland, Chevron was a franchisor and the plaintiffs were its franchisees. Section 2801(1)(A) defines the term "franchise" as any contract—

(i) between a refiner and a distributor,

(ii) between a refiner and a retailer,

(iii) between a distributor and another distributor, or

(iv) between a distributor and a retailer,

under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

Under § 2801(1)(B), the term "franchise" includes—

(i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of mo-

tor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;

\*   \*   \*   \*   \*   \*

(iii) the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

Other terms are explicated in § 2801(1)(B)(2), (3) and (4):

(2) The term "franchise relationship" means the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

(3) The term "franchisor" means a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

(4) The term "franchisee" means a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

The cutting edge of the Act is § 2802(a), the general prohibition against termination or nonrenewal of franchises:

(a) Except as provided in subsection (b) of this section and section 2803 [which applies to trial and interim franchises] of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may—

(1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

15 U.S.C. § 2802(a). Subsection (b) contains a number of grounds legitimating termination or nonrenewal of franchises by the franchisor. Particularly pertinent to this case is § 2802(b)(2)(E)(iii)(II):

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

\* \* \* \* \* \*

(E)(iii) in the case of leased marketing premises—

\* \* \* \* \* \*

(II) in the case of the sale, transfer, or assignment to another person of the franchisor's interest in such premises in connection with the sale, transfer, or assignment to such other person of the franchisor's interest in one or more other marketing premises, if such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor.

Section 2802(b)(2)(E)(iii)(II).

Another implicated section of the Act is 2806(b) which states:

(b) Nothing in this subchapter authorizes any transfer or assignment of any franchise or prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

Under the enforcement provision of the Act, a franchisee may maintain a civil action against a franchisor who fails to comply with the requirements of section 2802 or 2803. 15 U.S.C. § 2805(a). "[I]n order to establish a claim under the PMPA, the plaintiffs must prove as a threshold matter a termination or nonrenewal of their franchise relationship within the meaning of the PMPA. 15 U.S.C. § 2805(c)." *Ackley v. Gulf Oil Corp.*, 726 F.Supp. 353, 359 (D.Conn.) (granting defendants' motions for summary judgment because valid assignment did not constitute termination or nonrenewal of franchise), *aff'd*, 889 F.2d 1280 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1811, 108 L.Ed.2d 941 (1990). Once termination or nonrenewal has been established, the defendant franchisors "then bear the burden of establishing as an affirmative defense that the termination or nonrenewal was permitted under the Act." 726 F.Supp. at 359. *See also* 15 U.S.C. § 2805(c).

## C. *The Proceedings In The District Court*

### 1. Pretrial

The complaint named 18 Gulf and Chevron service station dealers in Massachusetts as plaintiffs. Two of these were dismissed on their own motions prior to trial; the case proceeded with 16 plaintiffs. The basis of the action is stated in paragraph one of the complaint.

1. This is a civil action commenced by Gulf and Chevron service station dealers seeking compensatory and injunctive relief pursuant to Title I of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801–2806, arising out of the sale by Chevron U.S.A., Inc. of its marketing assets in ten states, including the service stations operated by the plaintiffs in Massachusetts, to Cumberland Farms, Inc.....

Paragraph 50 of the complaint alleges in pertinent part:

50. The sale of Chevron on or about June 1, 1986, of all of its marketing assets in Massachusetts to Cumberland Farms and the sale, transfer and assignment to Cumberland Farms of Chevron's interest in and to the plaintiffs' leased marketing premises constituted a termination or non-renewal of each plaintiff's franchise in violation of PMPA....

Two weeks after the complaint was filed the district court entered a "status quo" injunction that allowed the plaintiffs to continue to operate under the terms of the existing franchise agreements with Chevron. This injunction remained in effect until the conclusion of the trial.

Chevron and Cumberland moved separately for summary judgment on the ground that as a matter of law the Act did not apply to the franchise assignments, or in the alternative, that, if it did, Chevron had effected a proper "market withdrawal" under § 2802(b)(2)(E) of the Act. Cumberland also asked for summary judgment on the basis that it had met the requirements of § 2802(b)(3) of the Act, which states the grounds for nonrenewal by the franchisor of a franchise relationship.

The district court denied defendants' motions for summary judgment. It first held:

> Under the circumstances of this case, and without determining the validity of the assignment under Massachusetts General Laws c. 106, § 2–210, I hold, as a matter of law, that the assignment from Chevron to Cumberland constituted a nonrenewal of the franchise relationships between Chevron and the plaintiffs under section 2802(a)(2) of the PMPA.

The court also rejected Chevron's "market withdrawal" ground for summary judgment, holding that there were questions of material fact as to whether Cumberland had offered a good faith nondiscriminatory franchise to the first thirteen plaintiffs. It stated:

> It is undisputed that Chevron neither made a bona fide offer to sell nor offered a right of first refusal to the plaintiff franchisees. It therefore becomes incumbent upon Cumberland to offer a good faith, nondiscriminatory franchise to each of the plaintiffs. If Cumberland failed to do so, Chevron cannot use the market withdrawal defense under section 2802(b)(2)(E).

The court then ruled that Chevron would be liable as a matter of law for Cumberland's failure to offer good faith nondiscriminatory franchises to the plaintiffs:[3]

> In short, Chevron will be held strictly liable for Cumberland's failure, despite Chevron's efforts to ensure that the status quo was maintained. Chevron can resort to the indemnification provisions of the Asset Purchase Agreement with Cumberland in the event that plaintiffs ultimately prevail in this action.

The court concluded that:

> the issues raised [by plaintiffs] are material to Cumberland's good faith and nondiscrimination and that therefore summary judgment is not appropriate on market withdrawal grounds. This holding extends to Cumberland's assertion of the section 2802(b)(3) defense where its "good faith" is also implicated.

The court did grant summary judgment to Chevron as to two plaintiffs, Yassin Gulf and Bob's Gulf Service, on the ground that Chevron had a right not to renew these franchises because they were "trial franchises." It denied Chevron's motion for summary judgment as to another plaintiff, Bolton Chevron Service, Inc., on the ground that there were triable issues of fact. The court, at trial, granted Chevron's motion for a directed verdict as to Bolton Chevron Service. Cumberland's motion for summary judgment as to those three plaintiffs was denied.

### 2. The Verdict

The court included in its jury instructions its pretrial ruling that Chevron would be liable for Cumberland's failure to offer nondiscriminatory franchise renewals in good faith to the plaintiffs. Seven special questions were submitted to the jury. The jury found, in answer to question one, that Chevron's determination to withdraw was made after the most recent renewal of the franchise agreement with each and every plaintiff. It found, in answer to question two, that Chevron's determination to withdraw was based on changes in relevant facts and circumstances. In answer to

---

**3.** Chevron has not challenged this ruling. *See Ewing v. Amoco Oil Co.,* 823 F.2d 1432, 1438 (10th Cir.1987).

question three, the jury found that Chevron's determination to withdraw was made in good faith and in the normal course of business. Under these three findings, question four did not admit of answer. The jury found in answer to question five that Cumberland had not offered nondiscriminatory franchises to thirteen plaintiffs in good faith. The answer to question six was an assessment of damages in favor of these thirteen plaintiffs. These jury findings and the court's ruling that Chevron would be liable for Cumberland's failure to offer good faith nondiscriminatory franchises to the plaintiffs meant that Chevron and Cumberland were liable under § 2802(b)(2)(E)(iii)(II) of the Act.

Question seven concerned the claims of Bolton Chevron Service, Yassin Gulf and Bob's Gulf Service only as to Cumberland. The jurors found that Cumberland did not persuade them that these franchises were not terminated "constructively," that is, that the changes and additions offered were not offered in good faith and in the normal course of business. Or to put it another way, Cumberland failed to persuade the jury "that it did not insist on changes and additions to prevent the renewal of the relationship."

For the reasons that follow we find that the assignment of Chevron's franchises to Cumberland did not implicate the Act and that the judgments in favor of all plaintiffs must be reversed.

## II.

There is nothing in the language of the Act stating or suggesting that a valid assignment of franchises as part of the sale of the assets of a refiner-distributor constitutes, without more, a termination or non-renewal of the franchise relationships between the selling franchisor and its franchisees.

■ The Act's legislative history demonstrates convincingly that Congress did not consider franchise assignments to be an "open sesame" to the Act. "The legislation is not intended to authorize or to prohibit franchise assignments; instead, as a general rule, assignability of franchises is a matter left to State law." S.Rep. No. 731, 95th Cong., 2d Sess. 42–43, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 901. Where PMPA franchise termination provisions and state-granted rights of franchise assignability conflict, the courts must harmonize the competing interests on a case-by-case basis. *Id.*

■ Our review of the case law has failed to uncover a single case by any other judge or court holding that the transfer of franchises by a refiner-distributor as part of the sale of its assets implicates the Act. The general rule is that assignments of franchises do not trigger the provisions of the Act so long as the assignments do not violate state law and do not violate the contract rights of franchisees.

The Act must be given " 'a liberal construction consistent with its overriding purpose to protect franchisees.' " *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.,* 869 F.2d 917, 921 (6th Cir.1989) (quoting *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1221 (7th Cir.1982)). But because it diminishes the property rights of franchisors, the Act "should not be interpreted to reach beyond its original language and purpose." *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.,* 869 F.2d at 921. *See also Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515 (1st Cir.1988) ("Although we have long acknowledged the need to construe the PMPA liberally to effectuate its ultimate objective—the granting of some meaningful measure of protection to service station franchisees—we have likewise borne in mind that the statute 'constituted a diminution of prior rights of franchisors and thus should not be extended beyond [its] language and purpose.' " (citations omitted)).

A two-part test has been used to determine whether the assignment of a franchise results in its constructive termination, thereby implicating the Act:

[T]o sustain a claim, under the PMPA, that a franchisor assigned and thereby constructively terminated a franchise agreement, the franchisee must prove either: (1) that by making the assignment, the franchisor breached one of the three

statutory components of the franchise agreement, (the contract to use the refiner's trademark, the contract for the supply of motor fuel, or the lease of the premises), and thus, violated the PMPA; or (2) that the franchisor made the assignment in violation of state law and thus, the PMPA was invoked.

*May–Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d at 922. In granting defendants' motions for summary judgment on the grounds that the assignment did not violate state law, did not result in the breach of a franchise agreement, and therefore was not a constructive termination of the franchise, the *May–Som* court noted, "[I]n an age of increasing corporate competition, the major petroleum firms must retain the freedom to seek greater economic efficiency through corporate reorganizations, mergers and acquisitions." 869 F.2d at 921. *See also Fresher v. Shell Oil Co.*, 846 F.2d 45, 46–47 (9th Cir.1988) (upholding dismissal of PMPA action where plaintiffs-dealers alleged assignment of lease and supply agreements but failed to allege breach of any of the agreements which were components of the franchise); *Cedar Brook Serv. Station, Inc. v. Chevron U.S.A., Inc.*, 746 F.Supp. 278, 282 (E.D.N.Y.1990) (granting defendants' motions for summary judgment because assignment which was valid under state law did not implicate the Act), *aff'd*, 930 F.2d 908 (2d Cir.1991); *Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.*, No. 86–4748 (D.N.J. May 9, 1990) (1990 WL 61787, 1990 U.S.Dist. LEXIS 5685) (valid assignment did not constructively terminate franchises); *Ackley v. Gulf Oil Corp.*, 726 F.Supp. 353 (granting defendants' motions for summary judgment because assignments of franchises valid under state law did not constitute termination or nonrenewal of franchises under PMPA). The *Ackley* court "decline[d] to accept a rule that an assignment necessarily constitutes a terminating event because the assignor does not continue as a party to the franchise relationship." 726 F.Supp. at 360 n. 9. On the basis of 15 U.S.C. § 2806(b), the court ruled "that the effect of the assignment as a terminating event under the PMPA is de-termined by reference to state law. A contrary holding would render § 2806(b) meaningless." *Id.*

Where an assignment is invalid under state law or violates the contract rights of the franchisee, however, the Act is implicated. In *Barnes v. Gulf Oil Corp.*, 795 F.2d 358, 363–64 (4th Cir.1986), the Fourth Circuit ruled that an assignment which violated a Virginia statute by increasing the burdens imposed on a franchisee might give rise to a cause of action under the Act. This is not the situation before us. Plaintiffs have cited no comparable provision under Massachusetts law, and we have found none.

The only case relied upon by the district court for its ruling that the Act was implicated by a *valid* assignment has been reconsidered and withdrawn as to the assignment issue. *See Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.*, No. 86–4748 (D.N.J. Sept. 25, 1987) (1987 WL 17496, 1986 U.S.Dist. LEXIS 8570) (holding on summary judgment motions that valid franchise assignments constituted nonrenewal within the meaning of the Act), *vacated in part, Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.*, No. 86–4748 (D.N.J. May 9, 1990) (1990 WL 61787, 1990 U.S. Dist. LEXIS 5685) (granting defendants' summary judgment motions and holding that unless an asset transfer is an invalid assignment under state law, it does not constructively terminate the franchises and trigger the Act).

The only other case we have found which holds that assignment per se constitutes nonrenewal of a franchise relationship is *John & Kostas Serv. Station, Inc. v. Cumberland Farms, Inc.*, 738 F.Supp. 607 (D.Mass.1990); it was decided by the same district judge who decided the case before us. Plaintiffs cite *Abadjian v. Gulf Oil Corp.*, 602 F.Supp. 874 (C.D.Cal.1984), as support for their argument, stating that the court "held that the assignment [of a Gulf franchise] violated the PMPA...." This characterization of the *Abadjian* case is misleading; the court found that there was no cause of action under the Act be-

cause no assignment of a franchise occurred. *Id.* at 881–82.

We think that the two-part test set forth in *May–Som* is helpful in determining whether the assignment of a franchise triggers the Act. There was no evidence in this case that the franchisor-assignor, Chevron, breached any one of the three statutory components of the franchise agreement: all thirteen dealers continued to occupy the same service stations under the same leases; they continued to purchase Gulf brand gasoline under the same supply agreements; and they continued to do business under the same Gulf trademark.[4]

Although the district court did not determine the validity of the assignment under Massachusetts law, we are satisfied that the assignment was permissible under state law. Massachusetts General Laws, chapter 106, § 2–210, states in pertinent part:

(1) A party may perform his duty through a delegate unless otherwise agreed or unless the other party has a substantial interest in having his original promisor perform or control the acts required by the contract. No delegation of performance relieves the party delegating of any duty to perform or any liability for breach.

(2) Unless otherwise agreed all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance....

Mass.Gen.Laws Ann. ch. 106, § 2–210 (1990). *See also Valley Oil Co. v. Barberian,* 344 Mass. 759, 183 N.E.2d 109 (1962) ("Leases may be assigned or sublet in the absence of provisions in the lease that this cannot be done."). We hold that under the facts here, the assignment by Chevron of its franchises to Cumberland did not implicate the Act.

III.

The main case was tried on the theory, and the jury so instructed, that the assignment of the franchises automatically triggered the Act and that Chevron would be liable as a matter of law, if the jury found, as it did, that Cumberland did not offer nondiscriminatory franchises to thirteen plaintiffs in good faith. The district court erred as a matter of law in its pretrial ruling and instruction to the jury. The judgment of the district court in favor of the thirteen plaintiffs against Chevron and Cumberland is reversed.

We next consider Bolton Chevron Service's appeal from the directed verdict in favor of Chevron. We affirm the district court. The question in this individual case is whether Chevron met the requirements of 15 U.S.C. § 2802(c)(4), which provides:

(c) As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as—

\* \* \* \* \* \*

(4) loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise—

(A) of the duration of the underlying lease, and

(B) of the fact that such underlying lease might expire and not be renewed during the term of such franchise (in the case of termination) or at the end of such term (in the case of nonrenewal)....

■ Chevron's underlying lease with the owner of the franchised premises was due to expire on September 30, 1986. The record confirms the district court finding that Chevron met the notification require-

---

**4.** Chevron had obtained this trademark when it merged with Gulf prior to the sale of its assets

to Cumberland.

ments of subsections (4)(A) and (B). Bolton Chevron Service's reliance on *Veracka v. Shell Oil Co.,* 655 F.2d 445, is both misplaced and myopic. In *Veracka* we held that the franchisor "refused to renew the franchise for a reason that the Act allows." *Id.* at 448. The same reasoning applies here. Chevron had a right not to renew the underlying lease of the premises, which it exercised. This non-renewal resulted in a termination of the franchise, subject to the provisions of § 2802(c)(4)(A) and (B), with which Chevron complied.

Finally we turn to the verdicts and judgments in favor of Bolton Chevron Service, Yassin Gulf and Bob's Gulf Service against Cumberland; the jury found that these franchises had been "constructively terminated." As to Bolton, it seems obvious that since its franchise had been legally terminated by Chevron, Cumberland could not "constructively" terminate it. There was no viable franchise in existence.

█ Yassin Gulf and Bob's Gulf Service stand on a different footing than Bolton, but the reasoning and the result are the same. Both Yassin Gulf and Bob's Gulf Service had one year "trial" franchises. Section 2803(a)(1) of the Act provides: "(a) The provisions of section 2802 of this title shall not apply to the non-renewal of any franchise relationship—(1) under a trial franchise...." The district court, finding that Chevron had properly nonrenewed the trial franchises under § 2803(a)(1) of the Act, granted Chevron's motion for summary judgment as to these plaintiffs. Because Chevron had legally terminated the trial franchises of Yassin Gulf and Bob's Gulf Service, Cumberland could not "constructively" terminate the franchises. The court, in effect, allowed the jury to shoot an already dead horse. The judgments in favor of these three plaintiffs against Cumberland are reversed.

Our rulings mean, of course, that the award of attorneys' fees to plaintiffs' counsel must be vacated.

### Summary

All judgments in favor of plaintiffs are reversed.

The directed verdict for Chevron against Bolton is affirmed.

Costs on appeal awarded to Chevron and Cumberland.