**RIVERDALE ENTERPRISES
INC., et al., Plaintiffs,**

v.

**SHELL OIL CO., et al., Defendants.**

No. Civ.A. 97–30281–KPN.

United States District Court,
D. Massachusetts.

Feb. 11, 1999.

Myles Jacobson, Jacobson & Thompson, PC, Springfield, MA, Linda J. Thompson, Jacobson & Thompson, P.C., Springfield, MA, for plaintiffs.

John F. Rogers, Cain, Hibbard, Myers & Cook, Pittsfield, MA, for defendants.

John F. Rogers, (See above), for O'Connell Oil Associates, Inc.

## MEMORANDUM WITH REGARD TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 18)

NEIMAN, United States Magistrate Judge.

The instant complaint arises out of a November 25, 1996 sale and assignment of several retail franchise agreements from Shell Oil Company, Inc. ("Shell"), the original franchisor, to O'Connell Oil Associates, Inc. ("O'Connell") (collectively "Defendants"). Five of the twelve franchises that were transferred and assigned—State Street Food Mart, Inc., Sullivan Shell Longmeadow, Inc., W.F.C.S., Inc., Westfield Food Mart, Inc., and the East Longmeadow location owned by Martin Sullivan and Kevin Prior ("East Longmeadow") (collectively "Plaintiffs")—maintain that Defendants' actions were unlawful and pursue various forms of relief.[1]

In Count I of their four count complaint, Plaintiffs seek declaratory and injunctive relief under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801

---

1. Riverdale Enterprises, Inc. is no longer a party, its claim having been dismissed by stipulation. (See Stip. of Dism. (Docket No. 25).)

*et. seq.*, pursuant to M.G.L. ch. 231A. In Count II, Plaintiffs seek like relief in accord with the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02. In Counts III and IV, Plaintiffs allege that Defendants' actions amount to unfair and deceptive trade practices in contravention of M.G.L. ch. 93A. With the parties' consent, the case has been assigned to the court pursuant to 28 U.S.C. § 636(c) for all purposes, including trial and entry of judgment.

Presently before the court is Defendants' motion for summary judgment in which, interestingly enough, Defendants themselves seek seven declarations in their favor. Defendants ask the court to find as a matter of law that the transactions at issue comport with the requirements of the PMPA, as well as state statutory and common law. In response, Plaintiffs have offered two declarations in their favor. In essence, Plaintiffs assert that, pursuant to the PMPA, any renewal of their franchises must ensure the continued supply of branded gasoline, i.e., motor fuel sold under a refiner's trademark.

## I.  *STANDARD OF REVIEW*

Summary judgment is appropriate where the record reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The facts must be viewed in a light most favorable to the non-moving party. *Santiago–Ramirez v. Secretary of Dep't of Defense of United States*, 62 F.3d 445, 446 (1st Cir.1995). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d, 13, 15 (1st Cir.1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The factual dispute claimed by the non-moving party must be "material" and the dispute over it "genuine." A "genuine" issue is one that only a finder of fact can properly resolve because it may reasonably be resolved in favor of either party, and a "material" issue is one that affects the outcome of the suit. *Aponte Matos v. Toledo Davila*, 135 F.3d 182, 186 (1st Cir.1998); *Collins v. Martella*, 17 F.3d 1, 3 n. 3 (1st Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Mere allegations or conjecture unsupported in the record are insufficient to raise a genuine issue of material fact. *Santiago v. Canon U.S.A., Inc.*, 138 F.3d 1, 5 (1st Cir.1998). Absent a genuine dispute of material fact, questions of law are appropriate for resolution on summary judgment. *Jimenez v. Peninsular & Oriental Steam Nav. Co.*, 974 F.2d 221, 223 (1st Cir.1992).

## II.  *FACTUAL BACKGROUND*

In the court's opinion, there are no genuine issues of material fact. The contested facts described by Plaintiffs, (*see* Dealer's Resp. at 7–18), do not alter the court's conclusion in this regard.

On November 25, 1996, Shell sold its rights to twelve retail marketing locations in Hampshire and Hampden counties to O'Connell. O'Connell supplies gasoline to stations which it owns and operates, to other stations which it owns but leases, and to still other stations which it neither owns nor operates. At the time, O'Connell was a distributor of Shell, Mobil and Citgo branded gasoline products.

None of the Plaintiffs whose five locations were assigned by Shell to O'Connell consented to the assignment. In fact, they collectively indicated that they would demand certain assurances were the assignment to take place. Plaintiffs' concerns were raised again when East Longmeadow was offered a franchise renewal on terms which Plaintiffs deemed unacceptable. East Longmeadow's is the first and only franchise to be subject to renewal since the assignment of the franchises from Shell to O'Connell. Despite the failure of O'Connell and East Longmeadow to resolve their dispute to date, O'Connell continues to supply gasoline to East Long-

meadow as well as each of the other plaintiffs

Prior to November 25, 1996, each of the twelve marketing locations was leased by Shell pursuant to the terms of a "Motor Fuel Station Lease." In addition, Shell and each of the dealers had a supply contract which provided that Shell would supply them with Shell gasoline products and the right to use the Shell trademark. Together, the lease and supply contract created a franchise instrument known as a Dealer Agreement ("Dealer Agreement"). At the time of the assignment in November of 1996, the Dealer Agreements with the various plaintiffs had different amounts of time left to their current terms.

Each Dealer Agreement is governed by the PMPA. Among the terms included in the Dealer Agreement is Shell's right to transfer or assign its interests. Specifically, the Dealer Agreement provides that "Shell shall have the right to sell, transfer or assign its interest in this Agreement. Following any assignment of this Agreement by Shell, Shell's assignee shall be substituted for Shell with respect to the rights and obligations of Shell provided herein." (Def. Exhibit C ¶ 17.4.) The Dealer Agreement also includes a Variable Rent Program ("VRP") which enables dealers to pay less rent upon the sale of gasoline exceeding a certain prescribed volume. The VRP, which evidently continues in effect at the twelve retail locations, is a voluntary program offered on terms unilaterally determined by the gasoline supplier.

Several documents were necessary to effectuate the sale and assignment to O'Connell of Shell's varying interests in the franchise locations. First, Shell and O'Connell executed a purchase agreement entitled Offer to Purchase Real Property and Other Real Property from Shell ("Purchase Agreement") with respect to those locations which Shell owned in November of 1996. An addendum to the Purchase Agreement requires that, "for a period of ten years beginning on May 1, 1997 (Amortization Period), [O'Connell] covenants, warrants and agrees that it shall purchase from Shell a minimum of Thirty One Million (31,000,000) gallons of Shell branded motor fuel per year, except that the minimum in year one shall be twenty Four Million (24,000,000) gallons." (Def. Exhibit F.) The Purchase Agreement further provides for the payment of liquidated damages in the event that O'Connell fails to purchase the specified minimum. The Purchase Agreement also states that it "shall remain an executory contract separate and apart from any other obligations and provisions in the Jobber contract in effect between the parties."

The Jobber Contract between Shell and O'Connell, which was executed on July 18, 1997, addresses the sale of Shell products to and the right to use the Shell trademark by O'Connell. In applicable part, the Jobber Contract provides that "Shell shall sell and deliver to [O'Connell] and [O'Connell] shall purchase and accept from Shell, the Products for which quantities are specified in [accord with an established] schedule in such quantities as [O'Connell] shall order from time to time, but as to each Product during each month not less than half nor more (except at Shell's option) than all of the quantity specified in the Schedule for such Product and month." The five year term specified in the Jobber Contract began on July 1, 1997, and is due to end on June 30, 2002.

Quitclaim deeds were also executed between Shell and O'Connell, parts of which include a ten year deed restriction during which O'Connell is required to use only Shell products at the twelve locations. Specifically, O'Connell agrees "that during a period of ten years from the date of execution of th[e] deed, no non-Shell Oil Company motor gasolines shall be stored on, sold or distributed from the premises herein conveyed or any part thereof. This restriction is for the benefit of [Shell], its successors and assigns."

All but one of the assigned Dealer Agreements pertaining to the instant litigation have expiration dates in the years 1999, 2000 and 2001. As indicated, only the franchise instrument pertaining to East Longmeadow has already expired. O'Connell has and expects to tender renewals of the franchise instruments, upon expiration, to each of the Plaintiffs. One particular modification in the franchise renewal tendered to East Longmeadow has created the present controversy, namely, O'Connell's reservation under certain circumstances to supply "O'Connell Approved Products" rather than Shell products to the dealer. (Pl.Docs. in Supp. of Summ. Judg. (Docket No. 31) Exhibit A.) To date, East Longmeadow has refused to agree to this modification.[2]

## III. DECLARATIONS SOUGHT

Plaintiffs have culled their original declaratory requests to two, namely, that the court declare that:

1. the Dealers (and/or their assigns) are entitled to PMPA franchise renewals without a provision allowing O'Connell to substitute unbranded for branded gasoline; and

2. the Dealers (and/or their assigns) are entitled to be offered another PMPA refiner's brand franchise, if O'Connell fails to renew its supply agreement with Shell, or if Shell and O'Connell enter into a mutual termination agreement.

Plaintiffs have agreed "to have their remaining claims dismissed without prejudice, with a provision that a new complaint (if any is filed in the future) would be based primarily on acts or omissions which occurred after the date of dismissal." (Dealer's Resp. (Docket No. 30) at 7 n. 6.)

In their motion for summary judgment, Defendants ask that the court declare:

1. The November 25, 1996 transfer of twelve marketing locations and assignment of related contractual instruments from Shell to O'Connell did not interrupt the leasehold possession of the marketing locations by the Plaintiff Dealers, the Plaintiff Dealers' supply of Shell motor fuel products or their right to use the Shell trademark in connection therewith and did not, therefore, constitute a termination of Plaintiff Dealers' franchises.

2. The assignment of the Plaintiff Dealer's "franchises", as that term is defined in 15 U.S.C. § 2801, et seq. (the "PMPA"), by Shell to O'Connell consisted of the assignment of the unexpired terms of the then existing leases and supply contracts.

3. The concerns expressed by the Plaintiff Dealers that as a result of the November 25, 1996 transfers and assignment to O'Connell, they might, at some time in the future, lose the benefit of one or more of the statutory elements of a PMPA franchise is too speculative and conjectural to constitute the basis of a claim of constructive termination of these PMPA franchises or unlawful assignment of them under Massachusetts law.

4. The transfers and assignments of the leases, supply contracts and other instruments by Shell to O'Connell on November 25, 1996 did not violate PMPA or Massachusetts law.

5. On November 25, 1996, Shell also assigned to O'Connell certain other instruments, including a Variable Rent Program ("VRP") but that is

---

2. Defendants have asked the court to strike as inadmissible hearsay certain portions of the affidavits of Plaintiffs Kevin Prior and Martin Tierney, as well as the affidavit of Martin Sullivan. Defendants claim that the affidavits speculate about potential losses and do not quantify losses actually sustained. Finding the affidavits immaterial, the court has acceded to Defendants' request and has not considered the affidavits for purposes of the instant motion.

not subject to PMPA limitations or termination and non-renewal.

6. O'Connell's proposal to include in its renewal instruments a provision to designate an alternate source of motor fuel supply (including an unbranded supply) in the event of a lawful termination of the Plaintiff Dealers' PMPA franchises constitutes neither a constructive termination of the Plaintiff Dealers' PMPA franchises, nor a material increase of the risks or burdens on the Plaintiff Dealers in connection with their supply contracts.

7. Neither the November 25, 1996 transfers and assignments by Shell to O'Connell, nor O'Connell's proposal reserving to itself the rights to lawfully designate alternate sources of motor fuel supply, state a claim under M.G.L. ch. 93A, to the extent that a claim under M.G.L. ch. 93A is not otherwise pre-empted by PMPA.

(Def.Mem. (Docket No. 24) 27–28.)

## IV. *RIGHTS SECURED BY THE PMPA*

In passing the PMPA, Congress intended to establish minimum federal standards for the termination and non-renewal of franchise agreements between small businesses and large oil companies. *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 921 (6th Cir.1989) (citing S.Rep. No. 731, 95th Cong., 2d Sess. 15, reprinted in 1978 U.S.Code Cong. & Admin.News 873, 877). A primary concern of Congress was to alleviate the potential use by large oil companies of threats and coercion to force adherence to their corporate marketing policies. *Id.* Congress therefore enacted the PMPA to ensure that franchisees would not suffer arbitrary or discriminatory treatment at the hands of the more powerful franchisor. *Id.*

■ Although the remedial provision of the PMPA should be afforded a liberal construction "consistent with the over-riding purpose to protect franchisees," *id.* (citing *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1221 (7th Cir.1982)), the PMPA's reach should be limited because its provisions may also cause a diminution of franchisor property rights. *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 940 F.2d 744, 750 (1st Cir.1991). Thus, the PMPA should not be interpreted to reach beyond its original language and purpose. *Id.* One court has described the PMPA as a "product of compromise." *Valentine v. Mobil Oil Corp.*, 789 F.2d 1388, 1390 (9th Cir.1986).

■ The pivotal portion of the PMPA at issue here provides that, with certain exceptions,

no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may—

(1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

15 U.S.C. § 2802(a). In order to trigger these protections, a franchisee must make a threshold showing that its franchise was terminated or not renewed. *Beachler v. Amoco Oil Co.*, 112 F.3d 902, 905 (7th Cir.1997).

■ The First Circuit, among other courts, has considered whether an assignment by a franchisor to another entity, in and of itself, rises to a termination or nonrenewal under the PMPA. The court concluded that a valid assignment will not amount to an unlawful termination or nonrenewal if the essential characteristics of the franchise relationship remain intact. *Chestnut Hill Gulf*, 940 F.2d at 750–51. *See also Sawhney v. Mobil Oil Corp.*, 970 F.Supp. 366, 371 (D.N.J.1997) (citing numerous cases from various jurisdictions for

the proposition that an assignment is not *per se* unlawful). An assignment that maintains the essential characteristics of the franchise does not, therefore, trigger the protections of the PMPA. *Chestnut Hill Gulf,* 940 F.2d at 750.

■ Absent a claim of a per se unlawful termination, a PMPA franchisee must show that a constructive termination has occurred. *Id.* at 748. To prove constructive termination, a franchisee must demonstrate that, when making the assignment, the franchisor either breached one of the three statutory components of the franchise agreement—the contract to use the refiner's trademark, the contract for the supply of motor fuel, and the lease of the premises—or made the assignment in violation of state law. *Id.* at 750-51. "Where PMPA franchise termination provisions and state-granted rights of franchise assignability conflict, the courts must harmonize the competing interests on a case-by-case basis." *Id.* at 750 (citing legislative history of the PMPA).

## V. DISCUSSION

Defendants argue that Plaintiffs are unable to show that any of the statutory elements of their respective PMPA franchises have been interrupted and, therefore, cannot demonstrate constructive termination as a matter of law. As described, Defendants' motion for summary judgment seeks various declarations to that end. In counterpoint, Plaintiffs maintain that they are justifiably concerned that O'Connell might lose or voluntarily forego its right to use the Shell trademark. Being forced to accept unbranded gasoline by O'Connell, Plaintiffs assert, amounts to a violation of the PMPA. In addition, focusing much of its attention on the second prong of the analysis set forth in *Chestnut Hill Gulf,* Plaintiffs assert that Defendants have violated the PMPA by failing to comply with state assignment law.

## A. Ripeness Doctrine

■ The Declaratory Judgment Act ("DJA") gives a federal court the authority in a "case of actual controversy within its jurisdiction" to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The DJA is designed to enable parties to clarify legal rights and obligations before acting upon them. *Ernst & Young v. Depositors Economic Protection Corp.,* 45 F.3d 530, 534 (1st Cir.1995). *See also Step–Saver Data Sys., Inc. v. Wyse Tech.,* 912 F.2d 643, 649-50 (3d Cir.1990) (citing legislative history). The DJA is "mirrored by Fed.R.Civ.P. 57" and, as such, "[t]he statute and the rule are functionally equivalent." *Ernst & Young,* 45 F.3d at 534 n. 8. Rule 57 provides that "[t]he procedure for obtaining a declaratory judgment pursuant to Title 28, U.S.C. § 2201 shall be in accordance with these rules." Summary judgment may serve as a mechanism for enforcement of rights under the DJA. Fed.R.Civ.P. 56(b). The Massachusetts Declaratory Judgment Act provides for a similar declaration of rights. M.G.L. ch. 231A.

■ The parties agree that, even when an action is brought pursuant to the DJA, a controversy must nevertheless be ripe in order for a federal court to render a decision. Courts generally employ a balancing test which weighs the parties' interests in a court deciding the issue against any potential hardship caused by delaying review. *Abbott Lab. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). When viewed in this way, the ripeness doctrine may be said to merge with the standing doctrine in that both assume the necessity and existence of a definitive injury. This judicially devised formula asks a court to measure whether the alleged injury is sufficient to overcome the fact that the court is being asked to speculate on the merits of a particular claim. *See Neely v. Benefits Review Bd.,* 139 F.3d 276,

279 (1st Cir.1998); *El Dia, Inc. v. Hernandez Colon,* 963 F.2d 488, 493 (1st Cir.1992).

The Massachusetts Declaratory Judgment Act also requires the existence of an actual controversy before a court may render its decision. Likewise, "the question whether an actual controversy exists is closely related to the issue of standing." *Mass. Assoc. of Indep. Ins. Agents & Brokers, Inc. v. Comm'r of Ins.,* 373 Mass. 290, 367 N.E.2d 796, 799 (1977) (citing *South Shore Nat'l Bank v. Bd. of Bank Inc.,* 351 Mass. 363, 220 N.E.2d 899 (1966)). "The purpose of both the actual controversy and the standing requirements is to ensure the effectuation of the statutory purpose of G.L. c. 231A, which is to enable a court 'to afford relief from ... uncertainty and insecurity with respect to rights, duties, status and other legal relations.'" *Mass. Assoc. of Indep. Ins. Agents,* 367 N.E.2d at 799 (quoting M.G.L. ch. 231A § 9). "Such proceedings are concerned with the resolution of real, not hypothetical, controversies; the declaration issued is intended to have an immediate impact on the rights of the parties." *Id.*

Here, the court must first determine if the assignment from Shell to O'Connell amounts to an actual violation of the PMPA or state assignment law. Second, the court must determine if O'Connell can incorporate into the renewal contract offered East Longmeadow the provision concerning non-branded gasoline. Third, and finally, the court must determine whether Plaintiffs can insist that their franchise renewals guarantee the supply of branded gasoline. As explained below, the court believes that the latter two questions are ripe with respect to the East Longmeadow's franchise only. Accordingly, the court addresses the assignment issue first.

**B.** *State Assignment Law*

█ Plaintiffs assert that O'Connell cannot represent with any surety that the Shell trademark will remain available for their use for the duration of the Jobber Contract, thereby violating state assignment law. In addition, Plaintiffs claim that the franchise renewal offered East Longmeadow, which allows for the substitution of unbranded gasoline for branded gasoline in certain circumstances, is enough to make the underlying assignment from Shell to O'Connell unlawful under state law. In counterpoint, Defendants maintain that the assignment from Shell to O'Connell was valid as a matter of state law and seek declarations to that effect. Despite extensive briefing by the parties, the court believes that the parties' dispute with respect to the assignment may be dealt with in short order.

The PMPA itself neither authorizes nor prohibits assignments. Rather, the PMPA leaves issues of assignment law to be resolved as a matter of state law. 15 U.S.C. § 2802(b)(1). *See Chestnut Hill Gulf,* 940 F.2d at 750–51. Accordingly, to advance their claims here, Plaintiffs must provide sufficient evidence that the assignment was made without its prior consent and that the assignment "increased materially the burden or risk imposed on [it]." M.G.L. ch. 106 § 2–210. In an effort to accomplish its task, Plaintiffs focus on the burden posed by O'Connell's potential loss or relinquishment of its right to use the Shell trademark, forgoing all other claims of increased risk and burden.

In the court's opinion, there is no basis for Plaintiffs' claim that the assignment *qua* assignment has materially increased their risks or burdens. Obviously, the assignment documents themselves do not specifically incorporate any such risk · or burden. By accepting the assignment, O'Connell committed itself to fulfill the obligations of the original franchisor, Shell, under the existing franchises, absent statutory grounds for non-renewal. Plaintiffs' speculation regarding the possible loss of the right to use a refiner's trademark is not in itself a material change to their contractual rights. *May–Som,* 869 F.2d at 924.

As in *May–Som*, Plaintiffs have "identified no facts on which they rely for the belief that [Defendants] may be unable to continue their supply arrangements. . . . Thus there is nothing—other than the plaintiff[s'] speculations—to suggest [that O'Connell] will be unable to supply the plaintiff[s] with motor fuel." *Id.* Although Plaintiffs allege that a dispute of fact exists as to the length of time which O'Connell's has secured Shell gasoline, that dispute is immaterial. As in *Chestnut Hill Gulf*, Plaintiffs "continue[ ] to occupy the same service stations under the same leases; they continue[ ] to purchase [Shell] brand gasoline under the same supply agreements; and they continue[ ] to do business under the same [Shell] trademark." *Chestnut Hill Gulf*, 940 F.2d at 752. Speculation regarding possible future violations of a PMPA statutory component is insufficient to support Plaintiffs' claims of increased risk or burden.

O'Connell's proposal to renew East Longmeadow's franchise on condition that it accept unbranded gasoline does not convince the court otherwise. That condition, proposed after the assignment from Shell to O'Connell was otherwise properly accomplished, does not undermine *post factum* the assignment itself. While O'Connell's proposal may raise other questions under the PMPA, discussed in greater detail below, it does not form the basis of a claim under state assignment law. For now, Plaintiffs have not demonstrated sufficient facts to suggest anything more than a hypothetical disruption in their gasoline supply.

Plaintiffs' second claim—that the potential loss by O'Connell of the right to use the Shell trademark materially increases their risk—has been previously tested without success. Plaintiffs argue, in essence, that, because their franchises with O'Connell, a jobber, is substantially different than their agreements with Shell, a direct gasoline supplier, their franchises have been materially impaired. As the Seventh Circuit has explained, "[n]o court has ever accepted this type of argument, however, and we are unwilling to be the first." *Beachler*, 112 F.3d at 908. This court agrees. To accept Plaintiffs' argument "would essentially mean that any assignment by a refiner to a distributor would violate" state assignment law. *Id.* Of course, if O'Connell were for some reason to forfeit its right to use the Shell trademark in the future, it might thereby breach its franchise agreements, entitling Plaintiffs, individually or perhaps together, to bring suit under the PMPA. *Id.* at 908–09. O'Connell acknowledges as much. That possibility, however, does not undermine the propriety of the present assignment under state law.

## C. Franchise Renewal

■ As to the issues surrounding franchise renewal offered by O'Connell to East Longmeadow, which Plaintiffs seek to challenge jointly, the court has determined that this controversy is ripe only as it relates to East Longmeadow. East Longmeadow alone has a lapsed franchise instrument. The next franchise due to lapse is that of W.F.C.S., Inc., on October 31, 1999. The remaining plaintiffs' franchises are not due to lapse until April and March of 2000 and July of 2001. Although the court can envision that its declarations regarding Defendants' and East Longmeadow's respective rights could influence the terms of renewal as the other franchises lapse, the court believes that the remaining plaintiffs offer speculative controversies only.

This holds true for the related declarations sought by Defendants as well. Although this controversy commenced when Plaintiffs alone were seeking declarations of rights, Defendants, in turn, have sought to have the court declare that the terms of the renewed franchise offered East Longmeadow do not violate any of the various Plaintiffs' PMPA rights. Here, too, the issues raised by these proposed declarations are ripe as to East Longmeadow only. Accordingly, further references to

the parties' respective positions will be addressed in terms of the East Longmeadow franchise alone.

The court must first determine whether the franchise renewal, as proposed by O'Connell, would inappropriately force East Longmeadow to waive its rights under the PMPA. As explained below, the court believes that O'Connell cannot insist on incorporating the disputed provision into the franchise renewal. The court must also determine whether East Longmeadow, as it asserts, is entitled to a provision in the franchise renewal which requires O'Connell to provide branded gasoline should O'Connell lose its right to use Shell products. The court concludes that East Longmeadow cannot insist on such a guarantee.

■ There is no dispute that a franchisor and, in turn, its assigns may alter the terms of a PMPA franchise instrument upon its renewal so long as the change is offered in good faith and does not change the essential characteristics of the franchise relationship. 15 U.S.C. § 2802(b)(37)(A). The "franchise relationship" consists of the mutual obligations and responsibilities between the parties arising from the marketing of motor fuel under a franchise. 15 U.S.C. § 2801(2). East Longmeadow concedes the point. If a renewed franchise agreement meets this test, the franchisor would have the right under the PMPA to terminate the franchise if the franchisee fails to accept the terms of the new contract. *See* § 2802(c); *Russo v. Texaco, Inc.*, 808 F.2d 221 (2d Cir.1986).

Equally undisputed, however, is the fact that the PMPA bars a franchisor from predicating the right to renewal of a franchise on the release or waiver of any right the franchisee has under the PMPA or any other federal or state law. 15 U.S.C. § 2805(f)(1)(A)–(B). It is with respect to this provision that the issue between East Longmeadow and O'Connell is truly joined.

In its proposed renewal, O'Connell seeks to require East Longmeadow, referred to as "Dealer," to abide by the following set of conditions, among others:

O'Connell shall sell and deliver to Dealer, and Dealer shall purchase and accept from O'Connell, such quantities of Petroleum Products as Dealer shall order from time to time.... The Petroleum Products shall be of the kinds, grades, brands and quality being sold generally by O'Connell at the time of delivery....

"Petroleum Products" is defined in the proposal as "motor· fuels and automotive lubricants which are 'O'Connell Approved Products.'" The term "O'Connell Approved Products" is defined as

the motor fuel and automotive products of Shell Oil Company, for so long as O'Connell maintained a contractual affiliation with Shell Oil company, or the motor fuel, automotive products and other goods or suppliers which O'Connell shall from time to time designate as O'Connell Approved Products.

Together, these provisions would require East Longmeadow to accept non-Shell products under certain circumstances.

In reserving the right to supply unbranded gasoline products in this manner, O'Connell maintains that it is merely anticipating the possibility that its franchise relationship with East Longmeadow could outlast its relationship with Shell. Moreover, should O'Connell lose the right to use the Shell trademark in the future, it wants to insure the continued supply of gasoline—possibly unbranded—to East Longmeadow. Acting "with typical contractual caution," O'Connell claims, it simply "desires to have the ability to keep its dealer network in place even if the PMPA-governed network were to come to a lawful end. It is for that reason that O'Connell has included in its renewal dealer instruments the definition of O'Connell approved products as to which the remaining Plaintiffs take exception." (Def. Reply (Docket No. 32) at 8.) East Longmeadow's concerns with respect to this reservation of

rights, Defendants claim, is speculative at best.

Even when viewed in a light most favorable to East Longmeadow, the facts demonstrate that the relationship between Shell and O'Connell will not terminate for at least five years from July of 1997. The Jobber Contract, dated July 18, 1997, provides for the sale of Shell products to O'Connell for a term of five years. The Addendum to the Purchase Agreement between Shell and O'Connell, dated November 25, 1996, provides that Shell will supply gasoline to O'Connell for a ten year period. Finally, in a letter dated November 20, 1997, O'Connell, through counsel, represented to East Longmeadow, as well as to the remaining Plaintiffs, that it anticipated a long and mutually beneficial relationship with Shell. Although these documents, taken together, do not guarantee that O'Connell will continue to purchase Shell products for any more than five years, the evidence supports Defendants' contention that the assignee, O'Connell, at least aims to continue along the same course as its assignor, Shell, by licensing its trademark and providing Shell gasoline. In the present context, however, this is not enough.[3]

Although the contractual provision to which East Longmeadow is opposed relates to facts which may only unfold in the future, East Longmeadow's concerns at the present time are very real. The very essence of the PMPA is to protect the contractual agreement as it relates to the use of a refiner's trademark. *Clark v. BP Oil Co.*, 137 F.3d 386, 392 (6th Cir.1998). Congress intended PMPA franchisees to have a "reasonable expectation of continuity" extending beyond the term of the immediate franchise. *Brach*, 677 F.2d at 1216. Non-renewal or termination of a PMPA franchise relationship is only authorized if "an event occurred which is relevant to the franchise relationship and as a result, termination or non-renewal is reasonable." 15 U.S.C. § 2802(b)(2)(C). A reasonable event, in addition to franchise fraud or bankruptcy, includes the loss of a franchisor's right to grant the use of the trademark which is the subject of the franchise at issue. 15 U.S.C. § 2802(c)(6). At the time of non-renewal or termination, a dealer may pursue a claim in court if the non-renewal or termination occurred in such a way as to violate its PMPA rights. The parties have no dispute on this point.

O'Connell contends that it is not seeking to have East Longmeadow waive any of its PMPA rights and that it will only proceed in a manner which the PMPA permits should it contemplate a change in the source of its gasoline supply. It nevertheless appears to the court that, at a minimum, O'Connell's proposed franchise renewal would require East Longmeadow to assent to a contract which runs counter to the proscriptions of 15 U.S.C. § 2805(f)(1), when read in conjunction with 15 U.S.C. § 2802. As set forth in 15 U.S.C. § 2805(f)(1)(A), "[n]o franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive ... any right that the franchisee has under" the PMPA. Interestingly enough, the statutory language in 15 U.S.C. § 2805(f)(1) was inserted by Congress in 1994, several years after the First Circuit's decision in *Chestnut Hill Gulf*.

Incorporated into the very definition of a PMPA franchise, as applicable here, is the "distribution of motor fuel under a trademark which is owned or controlled ... by

---

**3.** The court notes that, as the parties' negotiations have progressed O'Connell suggested to Plaintiffs that "an implied condition in the definition of O'Connell Approved Products is that, at the time O'Connell seeks to designate the products of a supplier as 'O'Connell Approved Products,' O'Connell have the legal right to do so. As ... offered ... in July, the definitional language could be modified by the phrase 'subject, however, to all applicable federal, state and local law,' if [Plaintiffs] would take comfort from that additional language. [O'Connell] would even throw in the extra phrase 'including, but not limited to the PMPA,' if you would prefer." (Dealer Doc. Exhibit A (letter of November 20, 1997).)

a refiner which supplies motor fuel to the distributor which authorized or permits ....,occupancy" of leased marketing premises. 15 U.S.C. § 2801. Thus, the availability of trademarked gasoline is at the heart of a PMPA franchise.

In the case at bar, the trademark in use under the original franchise is that of Shell. The fact that the unbranded gasoline provision may have been offered by O'Connell in good faith does not alter the fact that the availability of a refiner's trademark is fundamental to a PMPA franchise. By conditioning the renewal of the franchise on East Longmeadow's acceptance of non-branded products, even under limited circumstances, O'Connell would circumvent, if not threaten, the PMPA status of that agreement. O'Connell itself does not own or control a refiner's trademark. (Def. Ans. to Second Amended Comp. ¶ 26.)

■ By requiring the acceptance of unbranded gasoline as part of its renewal, O'Connell would cause East Longmeadow to waive its right to terminate the franchise upon the loss of a supply of branded gasoline. This runs counter to the Congressional intent to protect the presumably less powerful franchisee from the marketing policies of the more powerful oil company or its jobber. Granted, the PMPA specifically places limits on the franchisor's, rather than the franchisee's, termination or nonrenewal of a franchise. 15 U.S.C. § 2802(b). These limits were crafted to protect the franchisee. The PMPA does not thereby bar a franchisee from terminating the franchise relationship if the distributor can no longer supply branded gasoline. That right, while unarticulated, is obviously subsumed in the penumbra of a franchisee's PMPA rights. As remedial legislation, the PMPA must be given a construction consistent with its goal of protecting the independence of franchisees, *Humboldt Oil Co. v. Exxon Co., U.S.A.,* 695 F.2d 386, 389 (9th Cir. 1982), particularly when no leasehold interest of the franchisor is at stake. *Compare*

*Valentine,* 789 F.2d at 1391–92. By requiring East Longmeadow to commit at this time to accept unbranded gasoline, even under the limited circumstances described, O'Connell's proposed renewal would force East Longmeadow to forfeit its right of termination.

Of course, as explained, O'Connell, under certain defined circumstances, might lose or choose to end its relationship with Shell. The preconditions and grounds for termination or nonrenewal are strictly regulated by the PMPA and go to the core of its legislative mission. Should O'Connell lose or choose to end its use of the Shell trademark, East Longmeadow could mount a challenge under the PMPA, depending, of course, on the particular circumstances. Alternatively, if East Longmeadow wished to use O'Connell's nonbranded products at that time, the parties could enter into appropriate contractual negotiations. But if for whatever reason East Longmeadow does not now wish to commit to an agreement to accept unbranded gasoline, conditional as it may be, it cannot be forced to do so under the guise of a PMPA renewal. Accordingly Plaintiff's first declaration, as applicable to East Longmeadow, will be allowed.

Concomitantly, East Longmeadow cannot now insist, as it attempts to do in its second requested declaration, that its renewal contract with O'Connell must guarantee the supply of trademark gasoline, whether it be Shell or some other branded product. That particular requirement is nowhere mandated by the PMPA. The respective rights of East Longmeadow and O'Connell relative to O'Connell's possible loss of its use of the Shell trademark have been discussed and will not be repeated here. Of course, the parties may negotiate and mutually enter into whatever contract they wish. But to the extent the parties seek guidance as to what the PMPA requires, and in turn precludes, in the course of that negotiation, the court has spoken.

## VI. CONCLUSION

Believing its conclusions properly balance the franchisor and franchisee interests governed by the PMPA, the court will make the following declarations with respect to Counts I and II of Plaintiffs' complaint as well as Defendants' declaratory requests in their motion for summary judgment:

1. The transfer and assignment of the five franchise and marketing locations from Shell to O'Connell did not constitute a *per se* or constructive termination of those franchises.

2. The assignment of the five franchises from Shell to O'Connell consisted of the assignment of the unexpired terms of the then existing leases and supply contracts.

3. East Longmeadow is entitled to a PMPA franchise renewal from O'Connell without a provision allowing O'Connell to substitute unbranded for branded gasoline.

To the extent Plaintiffs or Defendants have sought other declarations, those requests are DENIED. All of Plaintiffs' remaining claims in Counts III–IV, including those withdrawn by Plaintiffs, (*see* Dealer's Resp. at 7 n. 6), are DISMISSED without prejudice.

A separate order shall issue.