**C.K. SMITH & CO., INC., Plaintiff,**

v.

**MOTIVA ENTERPRISES, LLC, Defendant.**

**No. Civ.A. 98–40173NMG.**

United States District Court, D. Massachusetts.

Dec. 21, 2000.

Mary Ellen McDonough, Sherin & Lodgen, Thomas Paul Gorman, Sherin and Lodgen LLP, Boston, MA, for Plaintiff.

Richard E. Powers, William J. Fidurko, Zizik, Lasalle & Powers, P.C., Weelesley, MA, for Defendant.

**MEMORANDUM AND ORDER**

GORTON, District Judge.

This case arises from the termination and nonrenewal of a lease for the operation by plaintiff, C.K. Smith & Co., Inc. ("C.K.Smith"), of a Texaco franchise retail gasoline station in Randolph, Massachusetts. C.K. Smith has filed this action against defendant, Motiva Enterprises, LLC ("Motiva"), arguing that Motiva's predecessor in interest, Star Enterprise ("Star"), improperly terminated and failed to renew the C.K. Smith franchise and lease under the Petroleum Marketing Practices Act ("the PMPA"), 15 U.S.C. §§ 2801 *et seq.* Pending before this Court is C.K. Smith's motion for summary judgment (Docket No. 36) and Motiva's cross motion for summary judgment (Docket No. 44).

## I. Background

C.K. Smith has been doing business with Star for more than 45 years as a wholesale gasoline dealer and since 1989 as a retail gas station franchisee in Randolph, Massachusetts. On July 27, 1989, C.K. Smith and Star entered into a lease-franchise agreement for a term running from August 1, 1989 through July 31, 1992. The lease provided, *inter alia,* that notices from Star to C.K. Smith would be sent to C.K. Smith's headquarters in Worcester, Massachusetts.

In 1992, when the lease was renewed for another three-year term, Star changed its notice policy to provide that all notices would be sent to the franchisee's address, in this case to the gas station in Randolph. That year and in 1995, the lease was routinely renewed.

On March 25, 1998, Star sent a new lease and sales agreement package ("the Renewal Lease") to C.K. Smith at the gas station in Randolph. C.K. Smith claims that no one in management ever received that package because a former C.K. Smith employee misplaced it on a bathroom shelf

at the Randolph station. As of April 24, 1998, Star had not received an executed Renewal Lease from C.K. Smith. On that date, Star gave written notice to C.K. Smith at the Randolph address, pursuant to Star's new general notice policy, that it would not renew the C.K. Smith lease when it expired on July 31, 1998. Star cited C.K. Smith's failure to agree to changes or additions to the provisions in the Renewal Lease as the reason for non-renewal. The notice also stated that Star's nonrenewal would be rescinded if C.K. Smith entered into a mutually-approved lease and sales agreement.

On June 24, 1998, Judith Smith, President of C.K. Smith, met with Star representatives, including John Molloy ("Molloy"), at the Randolph station to discuss certain maintenance issues and the Renewal Lease in general. The parties disagree as to what occurred at the meeting. C.K. Smith claims that Judith Smith told Molloy that she wished to review a Star document called the Freedom Five Hundred Manual before signing the Renewal Lease, but that she was not rejecting the terms of the Renewal Lease. C.K. Smith alleges that, in fact, it intended to sign the Renewal Lease all along. Star contends, however, that in response to Molloy's inquiry about whether C.K. Smith intended to sign the Renewal Lease, Judith Smith replied that she was not sure, but that she would let him know in the future.

C.K. Smith offers no explanation of whether Judith Smith ever followed up with Molloy concerning the Renewal Lease. Star claims that on or about July 16, 1998, Molloy telephoned C.K. Smith to report that he had not heard from Judith Smith regarding the Renewal Lease and that he never heard from her in response to that call.

As of Friday, July 31, 1998, the expiration date of the then current lease, the parties had not entered into a renewed lease and sales agreement. On Tuesday, August 4, 1998, Molloy called Judith Smith to inquire when C.K. Smith would vacate the premises. Judith Smith advised Molloy that C.K. Smith wished to continue as a franchisee and was willing to execute the renewal lease (presumably without amendment). She followed up the call with a letter confirming the same. C.K. Smith attempted to renew the lease and sales agreement throughout August 1998, but Star refused to accept the renewal, noting that C.K. Smith's lease had expired and demanding that it vacate the premises in Randolph.

On August 10, 1998, even as it continued its effort to renew, C.K. Smith filed the instant action, claiming that Star's refusal to renew the lease violated the PMPA. It sought injunctive relief 1) to enjoin Star from terminating the C.K. Smith franchise and lease, and 2) to compel Star to continue to provide gasoline and to perform all other terms of the unsigned Renewal Lease. This Court issued a preliminary injunction on August 13, 1998 ordering that business continue in the normal course and that Star perform the duties provided in the unsigned Renewal Lease.

## II. *Discussion*

### A. Summary Judgment Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (*quoting Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only where the party opposing summary judgment provides evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has satisfied its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*,

477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the nonmoving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993). If after viewing the record in the nonmoving party's favor, the Court determines that no genuine issue of material fact exists, summary judgment is appropriate.

## B. The Petroleum Marketing Practices Act

### 1. *Purpose of the PMPA*

The PMPA was enacted to set minimum federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel. *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.,* 940 F.2d 744, 746 (1st Cir.1991) (*citing* S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.C.C.A.N. 873, 873); *Desfosses v. Wallace Energy, Inc.,* 836 F.2d 22, 25 (1st Cir.1987). Congress recognized that petroleum franchisors were liable to abuse franchisees by terminating franchises for arbitrary or even discriminatory reasons. *Chestnut Hill,* 940 F.2d at 746. The Act was

designed to prevent franchisors from terminating or failing to renew franchise agreements for technical or minor contract violations or compelling franchisees to comply with franchisors' marketing policies.

*Id.* (citation omitted).

The cornerstone of the PMPA is 15 U.S.C. § 2802, which precludes franchisors from terminating any franchise or failing to renew any franchise relationship unless notification requirements are met and the termination or nonrenewal is based on specified grounds. Section 2802 provides:

(a) Except as provided in subsection (b) of this section ..., no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may—

(1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

Section 2802(a) makes a significant distinction between a "franchise" and the "franchise relationship". The term "franchise" refers to any number of contracts between a retailer/distributor and a supplier of motor fuel. 15 U.S.C. § 2801(1). Section 2802(a)(1) prohibits a franchisor from terminating a franchise before it expires.

The term "franchise relationship" refers to

the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

15 U.S.C. § 2801(2). The legal entity of the "franchise relationship" was created by Congress

"to avoid any contention that because the 'franchise' does not exist [after it expires,] there is nothing to renew," and to clarify that the PMPA "contemplates changes in the specific provisions of the franchise agreement at the time of renewal."

*DuFresne's Auto Service, Inc. v. Shell Oil Co.,* 992 F.2d 920, 926 n. 4 (9th Cir.1993) (*quoting* S.Rep. No. 731, 95th Cong., 2d Sess. 30, *reprinted in* 1978 U.S.C.C.A.N. 873, 888). Thus, when a "franchise" expires, the "franchise relationship" between the parties continues and it is that relationship which the franchisor is obligated to renew under § 2802(a)(2) unless the requirements of § 2802(b)(1) are met.

C.K. Smith alleges that Star violated § 2802(a)(2) by failing to renew the "franchise relationship" with C.K. Smith after the C.K. Smith franchise expired on July

31, 1998.[1] After reviewing the record in the light most favorable to C.K. Smith, as well as the relevant provisions of the PMPA, the Court finds that Star was justified in allowing the C.K. Smith lease to expire according to its terms and then declining to renew the "franchise relationship" with C.K. Smith.

### 2. *Star's Grounds for Nonrenewal and Termination of the Franchise Relationship with C.K. Smith*

Franchisors may decline to renew a "franchise relationship" only if they satisfy both prongs of § 2802(b)(1) of the PMPA which provides:

> (b)(1) Any franchisor may terminate any franchise . . . or may fail to renew any franchise relationship, if—
>
> > (A) the notification requirements of section 2804 are met; and
> >
> > (B) such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3).

Star satisfied both prongs of § 2802(b)(1) when it notified C.K. Smith of its intention not to renew the "franchise relationship" by mailing a notice of termination and nonrenewal on April 24, 1998 in which it stated grounds therefor.

■ First, the notice of termination and nonrenewal met the notification requirements of § 2804 and second, it stated that the nonrenewal was based on "the failure of you [C.K. Smith] and Star Enterprise to agree to changes or additions to the provisions of the above agreements [the C.K. Smith lease]." One of the grounds described in paragraph (3) of § 2802(b)(1) justifying nonrenewal is

> [t]he failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—

> > (i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and
> >
> > (ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

15 U.S.C. § 2802(b)(3)(A). C.K. Smith claims that § 2802(b)(3)(A) does not justify Star's nonrenewal because C.K. Smith agreed to the changes presented in the Renewal Lease as indicated by its acceptance of the terms thereof within two business days after the expiration of the existing lease. This argument rests on the proposition that, although C.K. Smith's "franchise" expired on July 31, 1998, the "franchise relationship" did not, and thus Star was obligated to renew that relationship if C.K. Smith agreed to the terms of the Renewal Lease after the expiration date.

The Court rejects that argument. Star clearly fulfilled its obligations under the PMPA when it attempted to renew the C.K. Smith franchise prior to the expiration date by 1) mailing the Renewal Lease to C.K. Smith at the Randolph station on March 25, 1998, 2) inquiring at the meeting on June 24, 1998 as to whether C.K. Smith intended to execute the Renewal Lease, and 3) initiating a follow-up telephone call to Judith Smith on July 16, 1998.

■ C.K. Smith fails to offer any evidence that it notified Star, prior to July 31, 1998, that it wanted or intended to execute the Renewal Lease. Nothing in the record suggests that any such communication was made or attempted. Instead, the record indicates that mismanagement, including

---

1. Section 2801(14)(A) of the PMPA defines "failure to renew" and "nonrenewal" as a "failure to reinstate, continue, or extend the franchise relationship—at the conclusion of the term or on the expiration date, stated in the relevant franchise."

the loss of the Renewal Lease and a lack of internal communication, led to C.K. Smith's failure to execute the Renewal Lease. This Court deems C.K. Smith's omission in that regard the equivalent of a "failure ... to agree to changes or additions to the provisions of the franchise...." under § 2802(b)(3)(A), and thus sufficient grounds for nonrenewal of the lease by Star.

In fact, this Court concludes that C.K. Smith's failure to execute the Renewal Lease constituted a voluntary agreement to the impending termination and nonrenewal of its "franchise relationship" on July 31, 1998, as provided for in Star's notice of termination and nonrenewal. Accordingly, after that date, there was no "franchise relationship" between the parties which Star was obligated to renew. *DuFresne's Auto Service, Inc. v. Shell Oil Co.*, 992 F.2d 920, 927 & n. 5 (9th Cir.1993) (franchisee who voluntarily agreed to termination of his franchise prior to its expiration had no "franchise relationship" to renew under the PMPA). Indeed, to conclude that a "franchise relationship" between C.K. Smith and Star extended past July 31, 1998 and that Star was obligated to renew that relationship despite C.K. Smith's failure to execute the Renewal Lease would put an undue burden on Star. Such a reading of the PMPA would indenture franchisors to franchisees by effectively prohibiting nonrenewals altogether.

C.K. Smith also argues that any "failure" on its part to agree to changes or additions to the existing lease in the form of the Renewal Lease before that lease expired was merely "technical or unimportant to the franchise relationship" and therefore insufficient grounds under § 2802(b)(3)(A) for nonrenewal by Star. The PMPA excludes from its definition of "failure" "any failure which is only technical or unimportant to the franchise relationship." 15 U.S.C. § 2801(13)(A).

Because Judith Smith sent Star a letter confirming C.K. Smith's willingness to enter into the Renewal Lease only a few days after July 31, 1998, C.K. Smith contends that its failure to execute before that date was insignificant. Furthermore, C.K. Smith argues that its failure to execute the Renewal Lease should be excused in light of a case from the Eleventh Circuit Court of Appeals which it cites for the proposition that the PMPA's provisions should not be strictly enforced. DuFresne's Auto Service, Inc. *v. Shell Oil Co.*, 992 F.2d 920, 927 & n. 5 (9th Cir.1993) (franchisee who voluntarily agreed to termination of his franchise prior to its expiration had no "franchise relationship" to renew under the PMPA). Indeed, to conclude that a "franchise relationship" between C.K. Smith and Star extended past July 31, 1998 and that Star was obligated to renew that relationship despite C.K. Smith's failure to execute the Renewal Lease would put an undue burden on Star. Such a reading of the PMPA would indenture franchisors to franchisees by effectively prohibiting nonrenewals altogether.

C.K. Smith also argues that any "failure" on its part to agree to changes or additions to the existing lease (in the form of the Renewal Lease) before that lease expired was merely "technical or unimportant to the franchise relationship" and therefore insufficient grounds under § 2802(b)(3)(A) for nonrenewal by Star. The PMPA excludes from its definition of "failure" "any failure which is only technical or unimportant to the franchise relationship." 15 U.S.C. § 2801(13)(A).

Because Judith Smith sent Star a letter confirming C.K. Smith's willingness to enter into the Renewal Lease only a few days after July 31, 1998, C.K. Smith contends that its failure to execute before that date was insignificant. Furthermore, C.K. Smith argues that its failure to execute the Renewal Lease should be excused in light of a case from the Eleventh Circuit Court of Appeals which it cites for the proposition that the PMPA's provisions should not be strictly enforced. *Hutchens v. Eli Roberts Oil Co.*, 838 F.2d 1138, 1143 (11th Cir.1988).

This Court rejects those arguments as well. First, there is no "failure" more important to the "franchise relationship" and less technical than a failure to enter into the very lease by which that relationship would be renewed. Second, C.K. Smith reads *Hutchens* too broadly. In *Hutchens,* the Eleventh Circuit affirmed a district court's decision not to demand strict compliance by a franchisor with the notice provisions in § 2802(c)(4). *Id.* But nothing in that decision, which involved a franchise entered into long before enactment of the PMPA, suggests that the holding was intended to apply beyond those particular facts to a case such as ours involving interpretation of a statutorily enumerated ground for nonrenewal of a "franchise relationship".

 Finally, C.K. Smith claims that Star violated § 2802(b)(3)(D)(ii) of the PMPA by allegedly refusing to renew the "franchise relationship" with C.K. Smith for the purpose of replacing C.K. Smith with a contract-operated retail outlet (a "CORO"). A CORO would presumably allow Star to control the price of gasoline sold at retail at the Randolph station and thereby misappropriate the good will of the station.

The cited provision of the PMPA prohibits nonrenewals based on a determination that the "franchise relationship" is unlikely to be economical to the franchisor if "made for the purpose of converting the leased premises to operation by employees or agents of the franchisor for such franchisor's own account. . . ."

Prior to the expiration of the C.K. Smith lease, a third party contacted Star to inquire about operating a CORO at the Randolph location. Both parties agree that Star advised the third party that if C.K. Smith did not execute the Renewal Lease on or before July 31, 1998, the Randolph station would be available. The parties also agree that Star did not proceed with plans to replace C.K. Smith with a CORO until after that date. Other than the contact initiated by the third party, C.K.

Smith offers no evidence indicating that Star had formed an intent to remove C.K. Smith and replace it with a CORO prior to the expiration of C.K. Smith's franchise on July 31, 1998. Evidence of that contact is simply insufficient to establish that Star based its nonrenewal decision on the desire to replace C.K. Smith with a CORO. Accordingly, Star did not violate § 2802(b)(3)(D)(ii).

## ORDER

For the reasons set forth in the Memorandum above:

1) the motion of plaintiff, C.K. Smith & Co., Inc., for summary judgment (Docket No. 36) is DENIED; and

2) the motion of defendant, Motiva Enterprises, LLC, for summary judgment (Docket No. 44) is ALLOWED.

So ordered.