# United States Court of Appeals
## For the First Circuit

_____

No. 01-1161

C.K. SMITH & CO., INC.,

Plaintiff, Appellant,

v.

MOTIVA ENTERPRISES LLC,

Defendant, Appellee.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

_____

Before

Torruella and Selya, Circuit Judges,

and Lisi,* District Judge.

_____

Thomas Paul Gorman and Sherin and Lodgen LLP on brief for
appellant.
Richard E. Powers, Karen M. Connors, and Zizik, LaSalle &
Powers, P.C. on brief for appellee.

_____

October 25, 2001

_____


_____

**SELYA, <u>Circuit Judge</u>.** This appeal requires us to determine whether a franchisor's decision not to renew a service station franchise violated the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2801-2841. The ousted franchisee, plaintiff-appellant C.K. Smith & Co., Inc. (CKS), complains that the decision of the franchisor, defendant-appellee Motiva Enterprises LLC, to discontinue the franchise relationship following CKS's failure to execute a renewal lease in a timely manner contravened the PMPA.[1] The district court rejected these importunings, <u>see</u> <u>C.K. Smith & Co.</u> v. <u>Motiva Enters.</u>, 126 F. Supp. 2d 34 (D. Mass. 2000), and so do we. The PMPA does not provide any relief for a franchisee who negligently fails to execute renewal documents in a timely fashion. Hence, we affirm the lower court's entry of summary judgment in favor of the franchisor.

## I. BACKGROUND

In accordance with the conventional summary judgment praxis, we take the material facts in the light most favorable to the nonmoving party (here, the plaintiff) and indulge all

_____

[1]The relationship at issue here was entered into between CKS and Star Enterprise. Star has since transferred all its assets and liabilities to Motiva, and the district court granted CKS's motion to substitute Motiva for Star as the party defendant. For simplicity's sake, we refer to the defendant throughout as "Motiva."

justifiable inferences in that party's favor. McCarthy v. N.W. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995).

CKS is a Massachusetts corporation engaged in myriad fuel-related businesses ranging from home delivery of heating oil to the operation of service stations. One such venture involved a service station in Randolph, Massachusetts. In mid-1989, CKS entered into a three-year lease and sales agreement with Motiva for the Randolph location and thereby established a franchise relationship within the contemplation of the PMPA. See 15 U.S.C. §§ 2801(1)-(2), 2802. The parties renewed the salient agreements (and the franchise relationship) for additional three-year periods in 1992 and 1995. The last of these renewals — the lease and sales agreement executed on or about August 1, 1995 — is at the core of the instant case.

The arrangement negotiated in 1995 was scheduled to expire on July 31, 1998. The lease provided, inter alia, that notices from Motiva to CKS would be addressed to the latter's "place of business," identified in the lease as the service station premises.[2] On March 25, 1998, Motiva mailed a renewal

---

[2]This provision was not fortuitous. The 1989 lease and sales agreement specified that notices were to be sent to CKS's principal place of business in Worcester, Massachusetts. Shortly thereafter, Motiva adopted a policy of sending renewal packages directly to the affected service station location. This change was embodied in the notice provisions of the 1992 and 1995 agreements.

package, containing a proposed renewal lease and sales agreement, to the Randolph location. CKS received the materials, but one of its employees misplaced them.

Nearly one month elapsed without any word from CKS to Motiva about the renewal package. Concerned by CKS's silence, Motiva sent written notice on April 24, 1998, advising CKS that the existing lease and sales agreement between the parties would not be renewed beyond the July 31, 1998 expiration date; that Motiva would terminate the franchise relationship on that date; and that the ground for nonrenewal was the parties' failure to reach agreement as to changes and/or additions to the governing documents. In the same communique, Motiva advised CKS that it stood ready and willing to rescind the notice of nonrenewal in the event that the parties entered into a mutually satisfactory lease and sales agreement for a period extending beyond July 31, 1998. CKS acknowledges that it received the nonrenewal notice.

On June 24, 1998, representatives of both companies met to discuss station maintenance issues and the possibility of a renewed franchise relationship. The parties provide differing accounts regarding the substance of that meeting. CKS's version, which we accept for summary judgment purposes, is that Judith Smith (CKS's president) told Motiva's representatives that she wanted to review the details of a program under which

Motiva reimbursed its franchisees for a portion of station repair costs (the so-called "Freedom Five Hundred Manual") before executing any documents, but that she gave no indication that she was rejecting any of the renewal terms proposed by Motiva.

As of July 31, 1998, CKS had not executed the renewal lease and sales agreement. Motiva deemed the franchise relationship at an end, and John Molloy, a Motiva official, called Judith Smith on August 4 to inquire about her plans for vacating the premises. During that conversation, Smith expressed her firm's desire to continue the franchise relationship and, for the first time, voiced a willingness to execute the documents forwarded by Motiva to CKS on March 25. Smith reiterated these sentiments in a follow-up letter of even date. Motiva spurned Smith's entreaties as too little and too late.

On August 10, 1998, CKS filed a complaint in which it claimed that Motiva had violated the PMPA by refusing to renew the lease and franchise relationship. The complaint sought both injunctive relief and money damages. The district court preliminarily enjoined Motiva from terminating the lease and franchise for the Randolph service station.

In due course, the parties cross-moved for summary judgment. In a closely reasoned rescript, the district court granted Motiva's motion and denied Smith's cross-motion. C.K. Smith, 126 F. Supp. 2d at 40. This appeal ensued. At its inception, we stayed the district court's order, see Fed. R. App. P. 8(a), and, therefore, the preliminary injunction remains in effect.

## II. DISCUSSION

We begin our analysis by limning the applicable standard of review. We next offer an overview of the pertinent portions of the PMPA, and then turn to the merits of the plaintiff's remonstrances.

### A. Standard of Review.

We review the district court's entry of summary judgment de novo. Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000). Such peremptory relief is justified only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, to escape summary judgment, CKS, as the party bearing the ultimate burden of proof, must

-7-

"affirmatively point to specific facts that demonstrate the existence of an authentic dispute."  McCarthy, 56 F.3d at 315. The parameters of this duty are familiar:  the contested facts must be material and the contest over them must be genuine.  Id. Moreover, those facts must be backed by competent evidence. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990).

Because CKS is the party opposing summary judgment, this court, like the court below, must test the adequacy of its proffer by resolving all conflicts in the record favorably to it and drawing all reasonable inferences to its advantage.  Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001).  There are, however, limits to this indulgence:  a reviewing court need not heed "conclusory allegations, improbable inferences, [or] unsupported speculation."  Medina-Munoz v. R.J. Reynolds Tobacco Corp., 896 F.2d 5, 8 (1st Cir. 1990).

### B. The PMPA:  An Overview.

The PMPA, 15 U.S.C. §§ 2801-2841, governs franchise arrangements for the sale, consignment, or distribution of motor fuel.  Congress enacted this statutory regime primarily to protect motor fuel franchisees by leveling the playing field between them and their franchisors (typically, large oil companies).  See Four Corners Serv. Station, Inc. v. Mobil Oil Corp., 51 F.3d 306, 310 (1st Cir. 1995); Veracka v. Shell Oil

-8-

Co., 655 F.2d 445, 448 (1st Cir. 1981). To accomplish this objective, the PMPA establishes minimum standards designed to prevent arbitrary or discriminatory discontinuance of franchise agreements. See Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc., 940 F.2d 744, 746 (1st Cir. 1991). In the paragraphs that follow, we delineate those features of the statute that underpin this appeal.

In the first place, it should be understood that the PMPA makes a distinction between a "franchise" and a "franchise relationship." As used in the PMPA, the term "franchise" covers the essential contracts between a retailer and a supplier (e.g., lease of retail premises, provision of motor fuel, use of the supplier's trademark in connection with retail sales). 15 U.S.C. § 2801(1). The broader term "franchise relationship" encompasses "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise." Id. § 2801(2). Congress created the legal rubric of a franchise relationship to preclude oil companies from asserting that because a franchise no longer exists after it expires, there is nothing left to renew. See S. Rep. No. 95-731, at 30 (1978), reprinted in 1978 U.S.C.C.A.N. 873, 888; see also DuFrense's Auto Serv., Inc. v. Shell Oil Co., 992 F.2d 920,

-9-

926 n.4 (9th Cir. 1993). Thus, even if the underlying agreements expire, the PMPA protects the franchise relationship by obligating the franchisor to renew the franchise, 15 U.S.C. § 2802(a)(2), unless the franchisor satisfies the requirements set forth in 15 U.S.C. § 2802(b) (discussed infra).

The PMPA maintains this binary approach in addressing a franchisor's right to discontinue an extant business relationship with a franchisee, specifically limiting both the franchisor's ability to "terminate any franchise" and its "fail[ure] to renew any franchise relationship." Id. § 2802(a)(1)-(2). Inasmuch as the instant case revolves around an expired lease agreement, our analysis focuses on the PMPA provisions pertaining to a "failure to renew" — a term of art that the PMPA defines as "a failure to reinstate, conclude, or extend the franchise relationship — at the conclusion of the term, or on the expiration date, stated in the relevant franchise." Id. § 2801(14)(A).

The second point that must be understood is the anatomy of the PMPA. The heart of the statute is section 2802, which reads in pertinent part as follows:

> (a) Except as provided in subsection (b) of this section . . . , no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may—
>
> . . . .

-10-

> (2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).
>
> (b) Precondition and grounds for . . . nonrenewal
>
> > (1) Any franchisor may . . . fail to renew any franchise relationship, if—
> >
> > > (A) the notification requirements of section 2804 of the title are met; and
> > >
> > > (B) . . . such nonrenewal is based upon a ground described in paragraph (2) or (3).

Id. § 2802(a)-(b)(1). Refined to bare essence, these provisions prohibit a motor fuel franchisor from failing to renew a franchise unless the franchisor gives adequate notice to the franchisee[3] and bases the failure to renew upon a ground sanctioned by the PMPA.

The PMPA spells out several permissible grounds for nonrenewal. See id. § 2802(b). Pertinently, those grounds include:

_____

[3]The PMPA's notice requirements are codified in 15 U.S.C. § 2804. CKS does not dispute that Motiva complied with these requirements, so it would serve no useful purpose to discuss them in any detail.

-11-

> (A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if —
>
> > (i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business.

Id. § 2802(b)(3)(A)(i). The principal issue raised in this appeal is whether Motiva appropriately invoked section 2802(b)(3)(A) as its basis for failing to renew the franchise relationship with CKS.

### C.  The PMPA Claims.

We turn next to CKS's claims under the PMPA. The letter sent by Motiva to CKS in April of 1998 stated that "the reason for the non-renewal of your franchise relationship is the failure of [the parties] to agree to changes or additions to the provisions of the [Lease and Sales Agreement]." This letter went on to declare that the proposed changes and additions had been arrived at by Motiva "in good faith in the normal course of business." CKS assails the stated ground for nonrenewal on several fronts.

First, CKS offhandedly suggests that Motiva cannot prevail because it failed to establish each and all of the grounds for nonrenewal set forth in 15 U.S.C. § 2802(b)(2)(A)-(B). This is sheer persiflage:  the PMPA only requires a

-12-

franchisor to establish a single ground for nonrenewal. See 15 U.S.C. § 2802(b)(1)(B) ("Any franchisor may . . . fail to renew any franchise relationship, if — . . . such nonrenewal is based upon a ground described in paragraph (2) or (3).") (emphasis supplied).

Second, CKS asserts that section 2802(b)(3)(A) does not apply because its failure to execute the renewal lease by the expiration date did not constitute a "failure to agree" within the meaning of the PMPA. This assertion, which seeks to exploit the difference between a franchise and a franchise relationship, rests on the notion that the franchise expired on July 31, but the franchise relationship endured; accordingly, Judith Smith's August 4 letter effectively signaled CKS's acceptance of the terms presented in Motiva's renewal package and Motiva was obliged to renew the franchise relationship.

This is pure, unadulterated sophistry. The record makes manifest that Motiva contacted CKS three times concerning the renewal of the Randolph franchise, but CKS failed to communicate a desire (let alone an intention) to execute the tendered documents before the July 31 expiration date. Whatever CKS now says that it subjectively intended, the fact remains

that it offered no objective manifestation of this intent to Motiva prior to the July 31 deadline.[4]

That ends the matter. We agree entirely with the district court that CKS's failure to give notice prior to July 31 of an intent to execute the renewal lease amounted to a "failure . . . to agree to changes or additions to the provisions of the franchise." C.K. Smith, 126 F. Supp. 2d at 39. That was a valid ground for nonrenewal under section 2802(b)(3)(A) of the PMPA.

CKS attempts to blunt the force of this conclusion by emphasizing the specialized meaning of "failure" in the context of section 2802(b)(3)(A). The word "failure," separately defined in the PMPA, expressly excludes "any failure which is only technical or unimportant to the franchise relationship." 15 U.S.C. § 2801(13). Building upon this PMPA-specific definition, CKS asseverates that its failure to execute the renewal lease qualifies as a "technical or unimportant" lapse (and, therefore, constituted an illegitimate basis for discontinuation of the franchise relationship). CKS casts this argument along the line that it substantially complied with the renewal request by acceding four days late to Motiva's requested

_____

[4]CKS claims that this oversight was the byproduct of a period of corporate turmoil. That may well be so, but it is beside the point.

terms, and that this is sufficient because PMPA provisions should not be strictly enforced.

To support this radical position, CKS relies heavily on the Eleventh Circuit's decision in Hutchens v. Eli Roberts Oil Co., 838 F.2d 1138 (11th Cir. 1988). There, the court refused to insist upon strict compliance with a specific PMPA provision that required a franchisor to give notice to its franchisee about the terms of an underlying lease with a third party. See id. at 1143. The court excused the franchisor's "technical" failure to comply with the notice provision in light of the franchisee's awareness of the very information that the notice, if given, would have contained. Id.

We believe that Hutchens is inapposite. Unlike Hutchens, which involved a PMPA notice provision, this case involves the interpretation of a statutorily enumerated ground for nonrenewal of a franchise relationship. We see no justification for judicially recalibrating the careful balance that Congress struck when drafting the PMPA. In all events, relaxing a plainly worded statutory directive to benefit an errant franchisee would be especially illogical where, as here, the franchisor had no inkling of the franchisee's willingness (or even its desire) to execute a renewal lease until after the existing lease had expired.

-15-

We will not paint the lily. In the absence of special circumstances — and we see none here — courts ought to defer to Congress's choice of phrase and give words used in a statute their ordinary and accepted meaning. CKS's failure to execute the new set of documents in a timeous manner was a substantial event of default. To characterize this failure as either a "technical" or an "unimportant" omission would require us to stretch those terms well beyond their customary meanings. See C.K. Smith, 126 F. Supp. 2d at 40 (astutely observing that "there is no 'failure' more important to the 'franchise relationship' and less technical than a failure to enter into the very lease by which that relationship would be renewed"). Thus, the particularized definition contained in 15 U.S.C. § 2801(13) does not advance CKS's cause.

In a related vein, CKS argues that the PMPA constitutes remedial legislation and, accordingly, must be given a liberal construction consistent with Congress's avowed purpose of protecting franchisees. See S. Rep. No. 95-731, at 15 (1978), reprinted in 1978 U.S.C.C.A.N. 873, 873-74. This principle, CKS says, should lead us to construe its August 4 letter as an effective acceptance of the terms set forth in the renewal package, notwithstanding that it was submitted late.

We agree with CKS's premise, but not its conclusion. The PMPA is remedial legislation and, as such, merits a relatively expansive construction. See Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988); Brach v. Amoco Oil Co., 677 F.2d 1213, 1221 (7th Cir. 1982). This is no reason, however, to take liberties with the PMPA's carefully stated provisions and reengineer the statute in the name of rough justice. After all, the PMPA diminishes franchisors' property rights and therefore "should not be interpreted to reach beyond its original language and purpose." Chestnut Hill Gulf, 940 F.2d at 750 (citation omitted).

Here, our review of both the text and legislative history of the PMPA yields no evidence that Congress either designed or intended the PMPA to protect franchisees from their own mistakes. Thus, extending the PMPA to the circumstances at bar would entail rewriting the statute — an endeavor beyond the proper province of the Judicial Branch, and one that we are unwilling to undertake. Cf. United States v. Charles George Trucking Co., 823 F.2d 685, 689 (1st Cir. 1987) (explaining that "courts have no warrant to rewrite a statute in the guise of 'interpretation'"). CKS is the author of its own misfortune, and the relief that it seeks in the name of a liberal

construction of the PMPA is outside the purview of any principled exercise in statutory interpretation.

CKS also makes the bare allegation that Motiva's decision not to renew was made in bad faith and outside the ordinary course of business.  To this end, CKS suggests that Motiva's rejection of its belated entreaty to continue the franchise relationship was a fait accompli because Motiva already had decided, well in advance of July 31, 1998, to replace CKS with a contract-operated retail outlet (CORO).[5] Switching from a franchisee to a CORO, CKS posits, would give Motiva the ability both to set the retail price of gasoline at the Randolph location and to extract windfall profits.  For this reason, CKS says, Motiva's course of conduct contravened section 2802(b)(3)(D)(ii) of the PMPA.[6]

The fundamental difficulty with this suggestion is that the record does not support it.  The only proof on the point is that prior to the expiration of CKS's lease, a third party, Dia

---

[5]A CORO does not operate under a franchise relationship, but, rather, operates under a management contract whereby the franchisor pays the CORO a stipend (often involving a percentage of the station's revenues or profits) to run the station.

[6]This section provides in substance that a franchisor may not fail to renew a franchise subject to the PMPA if the franchisor's underlying purpose in failing to renew is to "convert[] the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's own account."  15 U.S.C. § 2802(b)(3)(D)(ii).

-18-

George Salem, inquired about operating as a CORO at the Randolph location. The record is uncontradicted that Motiva advised Salem that the site would be available for that purpose only if CKS failed to renew the lease in a timely manner. There is not a shred of evidence that Motiva took any action to supplant CKS with a CORO until after July 31, 1998 (that is, until after CKS had left Motiva high and dry). As the district court concluded, the evidence here "is simply insufficient to establish that [Motiva] based its nonrenewal decision on the desire to replace C.K. Smith with a CORO." C.K. Smith, 126 F. Supp. 2d at 40. Consequently, we reject out of hand CKS's section 2802(b)(3)(D)(ii) claim.

## D. **The Role of Equity**.

CKS makes a last-ditch argument independent of the PMPA. This argument invites us to apply equitable principles and fashion relief to avoid a forfeiture. See 1 Dan B. Dobbs, Dobbs Law of Remedies § 2.3(4)(2d ed. 1993) (discussing the maxim that "equity abhors a forfeiture").

This initiative need not detain us. Assuming, for argument's sake, that equity may play a role in an appropriate franchise dispute, equitable relief is simply not warranted here. CKS was entirely to blame for its failure to execute the renewal documents in a timely manner. See C.K. Smith, 126 F.

-19-

Supp. 2d at 38-39 (explaining that "mismanagement, including the loss of the Renewal Lease and a lack of internal communication, led to C.K. Smith's failure to execute the Renewal Lease"). Motiva did nothing wrong. Thus, CKS has no footing to mount a claim in equity. Cf. Sandstrom v. ChemLawn Corp., 904 F.2d 83, 87 (1st Cir. 1990) ("Equity, after all, ministers to the vigilant, not to those who slumber upon their rights.").

## IV. CONCLUSION

We need go no further. While the PMPA offers motor fuel franchisees broad protection, it does not aspire to safeguard them from the predictable consequences of their own errors. Discerning no genuine issue of material fact such as would necessitate further legal proceedings, we uphold the lower court's grant of brevis disposition in the defendant's favor.

**The entry of summary judgment is affirmed, the stay previously issued is dissolved, and the preliminary injunction is vacated. Costs are awarded in favor of the appellee.**